### In re WARREN BROS. CO.

#### No. 60186.

District Court, D. Massachusetts.
Jan. 29, 1942.

George B. Crafts, of Cambridge, Mass., for debtor.

John M. Foster, of Boston, Mass., for Boston Bondholders Committee.

W. C. Roper, Jr., of Washington, D. C., for Securities and Exchange Commission.

John Rich, of Boston, Mass., for Common Stockholders Committee.

Clarence L. Newton, of Boston, Mass., for Boston Preferred Stockholders Committee.

Maxwell Katz, of New York City, for New York Bondholders Committee.

Edward Williamson, of Boston, Mass., for New York Preferred Stockholders Committee.

BREWSTER, District Judge.

This corporation petitioned for reorganization under former section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. By order of this court, certain sections of chapter X of the present Bankruptcy Act, 11 U. S.C.A. § 501 et seq., have been made applicable to these proceedings. Among them are sections 171 and 174, which provide for approval of a plan of reorganization before it is submitted for acceptance.

The debtor has filed a plan and, after due notice, a hearing was held for the consideration of objections and amendments. Subsequently debtor petitioned for leave to modify the plan by amendments and additions. Motions to amend it have been duly presented and allowed. The petition for leave to modify is granted and the plan, as thus modified, is the plan with which this opinion deals.

The plan and all modifications have been submitted to the Securities and Exchange Commission, and the court is advised that the Commission will submit no report.

Before taking up the plan, it will be helpful to present some facts already established in these proceedings.

The debtor is a holding company. Its assets consist of bonds of the Cuban Republic and other securities; stock in subsidiaries and affiliated companies, operating and non-operating; and assets other than securities. After full hearings by the referee and the court, the value of the debtor's assets has been established, by order entered June 11, 1941, at $13,151,607.19.

The creditors are of two classes—those with claims, based upon direct liability, aggregating $8,358,984.10; and those with claims, based upon indirect liability, aggregating $20,296.09.

In the former class are holders of 5½% gold notes, which matured March 1, 1937, in the principal amount of $1,487,500, with accrued and unpaid interest computed through July 31, 1941, amounting to $483,983.19; and holders of 6% sinking fund debentures, which matured March 1, 1941, in the principal sum of $4,457,000, with interest through July 31, 1941, amounting to $1,-581,992.77. This indebtedness is not secured by any lien upon the assets of the debtor corporation.

The capital stock of the corporation is divided into 16,420 shares of $1 Cumulative First Preferred stock; 4,692 shares of $1.-16⅔ Cumulative Second Preferred stock; 40,907 shares of $3 Cumulative Convertible Preferred stock; and 472,923 shares of Common stock. All the shares are without par value, and each class of Preferred stock is given priority in the event of liquidation, the First and Second Preferred to the extent of $16.66⅔ per share, and the Convertible Preferred to the extent of $50 per share.

The accrued and unpaid dividends on the First Preferred amount to $157,317.10; on the Second Preferred to $52,445.42; and on the Convertible Preferred to $1,175,768.05.

The plan, as submitted, provides for the issue by a new corporation or by the debtor of not over $4,150,300 of Collateral Trust 4½% bonds, Series A, due February 1, 1956; and not over $4,150,300 of Collateral Trust 5% Cumulative Income bonds, Series B, due August 1, 1977; both Series to be dated as of August 1, 1941.

Each holder of gold notes will receive, according to the plan, $680 of Series A and $680 of Series B in exchange for each $1,000 of notes and coupons thereon.

Each holder of debentures will receive $700 of Series A and $700 of Series B in exchange for each $1,000 of debentures and coupons.

This distribution plus a small cash payment will equal not only the amount of principal and interest on the gold notes and debentures but also interest at the rate of 5½% and 6% respectively on unpaid instalments of interest.

Creditors are given an election to accept for each $2,000 of their claim $1,000 of Cuban bonds maturing 1955 and $1,000 of Cuban bonds maturing 1977. The balance of the claim of a creditor exercising such election is payable in equal principal amounts of Series A and Series B bonds, with cash adjustments to obviate the issuing of scrip in amounts less than $10.

The bonds, issued under the plan, are to be issued under a Collateral Trust Agreement which will create a first lien upon 4½% Cuban bonds of a principal amount equal to the principal amount of the bonds to be issued under the Collateral Trust Agreement (that is to say $8,300,600, less the amount taken by creditors electing to accept Cuban bonds) and also upon the greater portion of the other assets of the debtor which will be pledged as collateral security for both Series A and Series B bonds.

The Collateral Trust Agreement will contain provisions for a sinking fund; the retirement of bonds before maturity; within limitation, for exchange of bonds issued under the plan for Cuban bonds; and other provisions usually found in such instruments.

Other creditors whose claims are $200 or less will be paid in full in cash. If over $200, the creditor will receive $100 of Series A and $100 of Series B for each $200 of indebtedness.

The capital stock of the reorganized or new corporation will consist of 21,112 shares of Class A stock entitled to a cumulative preferential dividend of $1.35 per share and to receive in liquidation $27 per share; 40,-907 shares of Class B stock entitled to a cumulative preferred dividend of $2.50 per share and to $50 per share in case of liquidation; and 236,862 shares of Class C stock.

Voting rights are accorded to holders of each class of stock. Restrictions are imposed on payment of dividends in case of default on the interest or sinking fund pay-

ments and on the purchase of shares so long as bonds are outstanding.

The Class A stock will be exchanged, share for share, with holders of First and Second Preferred. The holders of the Convertible Preferred will receive 40,907 shares of Class B and also 118,631 shares of Class C stock. The Common stockholders will receive 118,231 shares of Class C stock or one share for each four shares of Common stock held by them. Ample provisions are made for the payment of taxes, current obligations and expenses of administration.

■ It is the duty of the court, under section 174 of chapter X of the Bankruptcy Act, 11 U.S.C.A. § 574, to determine (1) whether, in its opinion, the plan complies with section 216 of the Act, 11 U.S.C.A. § 616; and (2) whether it is fair, equitable and feasible.

It is my opinion that the plan as modified meets all the requirements of section 216.

■ The more important question presented is whether the plan may properly be submitted to the creditors and stockholders for acceptance as fair, equitable and feasible.

The debtor is solvent by a comfortable margin. The stockholders have a substantial equity which entitles them to participate in the plan. The creditor's priorities have been recognized to the full extent of principal and interest to the date of the new securities. While the interest rate has been reduced and the time of payment extended, it is not strictly accurate to say that the old note-holders and debenture-holders receive no compensation for this extension of time and reduction of interest. Obviously, the language of the statute (216(1), which provides that the plan shall include provisions altering or modifying the rights of creditors and stockholders, contemplates that new securities may be offered in exchange for old securities which do not carry the same dates of maturities or the same rates of interest. It is said that one of the purposes of 77B was to avoid the consequences to debtors and creditors of foreclosure liquidation or forced sale with the deflationary effect. Case v. Los Angeles Lumber Products Co., Ltd., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110.

The statute does not specifically provide that creditors must be compensated for reduced income or extension of time of payment, but if compensation is a prerequisite to a fair plan, such compensation is to be found in the plan submitted. The holders of

outstanding unsecured obligations receive in exchange a secured obligation, secured by an equal principal amount of Cuban bonds and by the greater portion of the other assets of the corporation.

It is obvious, from an examination of the indentures under which the old gold notes and old debentures were issued, that these securities were, to an essential extent, dependent upon the proceeds of $9,000,000 of 5½% sinking fund notes of the Treasury of the Republic of Cuba maturing in 1935, for servicing and retirement. The default of the Cuban Government respecting these notes brought about these proceedings under 77B, and the debtor has been obliged to accept new obligations bearing a reduced rate of interest. All of these new obligations of the Cuban Government, excepting those reserved to pay expenses of these proceedings and those accepted in lieu of bonds issued under the plan, together with the greater portion of the other assets of the corporation, which, in these proceedings, have been given a value of over $4,000,000, will be pledged as collateral to secure the new bonds. It would not be unreasonable to suppose that the new bonds, with the reduced rate of interest, would obtain a market value fully as high as that of the old notes and debentures given up in exchange.

Furthermore, the holders of the old notes and debentures not only receive interest at the rate stipulated therein to the date of the new bonds but also interest at the same rate on all instalments of interest unpaid July 31, 1941. This interest on interest amounts in the aggregate to over $329,000. Note holders and debenture holders have been represented by committees and these committees by attorneys who appeared at the hearing on the question of approving and modifying the plan submitted, and no sound reason was advanced for rejecting it as unfair to creditors.

As to the stockholders, the holders of First and Second Preferred will receive new stock, with a larger preferential dividend equal to 5% of the value of their equity, since in the event of liquidation they will be preferred to the extent of $27 per share. This liquidation value gives the First Preferred a slight increase in the equity and the Second Preferred a slight decrease, thus compensating for the loss of priority of the First Preferred over the Second Preferred. The holders of Convertible Preferred will receive an equal number of shares of new Class B stock which carries the same liqui-

dating right as the old but a slightly less preferential dividend. As compensation for this and the accrued and unpaid dividends, they will receive 118,631 shares of Class C stock, or a little over one-half of the equity represented by that class. The balance of the Class C stock goes to the Common stockholders. On established values, increased by income already acquired, the stockholders appear to have been fairly dealt with.

Respecting the feasibility of the plan, I think it is generally conceded that, in view of the circumstances of the case, and the materials at hand, it is as feasible a plan as could be devised. Certain criticisms have been leveled at it, but they do not convince me that it may not properly be submitted for acceptance. If it is complicated, and I do not think this serious, it is because of the number of interests that are to be considered with their several priorities. If the funded indebtedness has been increased, the increase is due to the addition of the accrued interest on the notes and debentures. If the plan did not make this provision, it might be held unfair, in view of Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982.

It may be noted that the carrying charges for the new bonds will be little more than for the old. If the amount of debts is out of proportion to the capital, it is because the former cannot be reduced without violating the rule of absolute priority. Obviously, it would be futile to increase the capital stock.

The interest on the pledged Cuban bonds will be sufficient to service the new bonds to within about $20,000, and if the Cuban Republic defaults it has been estimated that the other income of the obligor will be ample to service Series A. It is doubtless true that the ultimate success of the plan depends upon whether the Cuban Republic pays the principal and interest of the Cuban bonds which have been hypothecated as security. That uncertainty is inherent in the situation with which the creditors and stockholders are necessarily confronted. It is difficult to conceive of any plan of reorganizing debtor's capital structure which would remove all doubt respecting the future of the Cuban bonds. It is not fair to the Cuban Government or to the old stockholders to assume that the Republic of Cuba will repudiate its just obligations.

I find that the plan, as modified by the petition for leave to modify as amended, is fair, equitable and feasible.

The plan, so modified, is approved, and an order may be entered approving the same and fixing a time within which creditors and stockholders affected thereby may accept the same.