CENTRAL STATES ELECTRIC CORPORATION et al. v. AUSTRIAN et al.

No. 6123.

United States Court of Appeals Fourth Circuit.

Argued July 6, 1950.

Decided Aug. 16, 1950.

Thomas B. Gay, Richmond, Va., Leo B. Mittelman, T. Roland Berner, pro se, Thomas F. Boyle and Morton G. Rosenberg, all of New York City (Hunton, Williams, Anderson, Gay & Moore, H. Merrill Pasco, all of Richmond, Va., Boyle, Feller, Stone & McGivern, James P. Reeves, all of New York City, Wallerstein, Goode, Drewry & Adamson, Richmond, Va., Stephen D. Finale, Karelsen, Karelsen, Rubin & Rosenberg, all of New York City, John H. Bocock, George E. Allen Sr., Richmond, Va., Norman S. Nemser, New York City, Alfred J. Kirsh, Richmond, Va., Stanley Nemser, New York City, Leonard L. Cowan, Washington, D. C., and B. Gary Blake, Richmond, Va., on brief), for appellants.

Roger S. Foster, General Counsel, Washington, D. C. (Lawrence M. Greene, Special Counsel, Philadelphia, Pa., Manuel F.

Cohen, Brooklyn, N. Y., and Aaron Levy, Washington, D. C., on brief), for Securities and Exchange Commission.

Walter H. Brown, Jr., George Rosier, New York City, Thomas C. Egan, Philadelphia, Pa., and Fred G. Pollard, Richmond, Va. (Austrian & Lance, Saul J. Lance, Wilkie, Owen, Farr, Gallagher & Walton, all of New York City, Denny, Valentine, & Davenport, Charles S. Valentine, Williams, Mullen & Hazelgrove, Guy Hazelgrove, all of Richmond, Va., Harry R. Axelroth, Philadelphia, Pa., David J. Mays, Richmond, Va., Francis E. Walter, Easton, Pa., and Tucker, Mays, Cabell & Moore, Richmond, Va., on brief), for appellees.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from an order of the United States District Court for the Eastern District of Virginia approving a plan for the reorganization in bankruptcy under Chapter X of the Central Electric Corporation (hereinafter called Central). Petition for reorganization was filed in 1942 and for more than eight years the affairs of the corporation have been in the hands of the court. At the time the petition was filed, the assets of the corporation had shrunk to $1,400,000. Since then, they have increased to $38,000,000. This does not include contingent claims represented primarily by the lawsuit against Harrison Williams and others pending in the United States District Court for the Southern District of New York. In July, 1948, the trustees filed with the court a plan of reorganization. Criticisms were made by interested parties and an amended plan was submitted in December, 1948, which was referred to the Securities and Exchange Commission and was carefully considered and discussed by it along with plans submitted by the debtors and certain stockholders' committees in a report filed December 19, 1949. Subject to certain minor changes suggested by the Commission, the plan of the trustees was given its unqualified approval, and was approved by the court below in an order dated March 30, 1950. On April 1, 1950, the Commission approved the trustees' plan as thus amended, and on April 24 order of the court below was entered approving it as amended. Appeal was taken from this order by the debtor and certain of the stockholders.

Another appeal, consolidated with that taken from the order approving the plan of reorganization, was that taken from an order of May 24, 1950, directing the trustees to vote the stock of American Cities Power and Light Corporation held by them as trustees in favor of the liquidation and dissolution of American Cities as recommended by them in their report. The lower court refused to stay this order pending appeal, but it was stayed by this court on condition that the appeal be consolidated with the appeal from the order approving the plan of consolidation and that the appeals as consolidated be heard promptly.

Central, as of February 28, 1950, had outstanding (in round numbers) against it, the following claims (exclusive of reorganization expenses):

| | |
|---|---|
| Debentures (including interest) | $20,700,000 |
| 7% First Preferred stock (liquidation preference including dividend arrearages) | 15,800,000 |
| 6% Junior Preferred Stock (liquidating preference including arrearages) | 31,300,000 |
| Common stock (par value $1) shares | 10,100,100 |

Central, while an "investment company" within the meaning of the Investment Company Act of 1940, 15 U.S.C.A. §§ 80a—1 to 80a—52, and registered as such, is, in an economic sense, primarily a holding company with a rather inactive portfolio of securities, of which the most important holdings are in Central's subsidiaries, American Cities and Blue Ridge Corporation. Central owns about 82% of the common stock of American Cities and, directly, 31% of the common stock of Blue Ridge. American Cities, while likewise a statutory investment company, is in turn primarily an intermediate holding company in the pyramid through which Central controls Blue Ridge. American Cities' principal assets consists of 42% of the Blue Ridge common stock. Through control of American Cities,

Central's direct and indirect ownership in Blue Ridge amounts to 73% of the common stock of Blue Ridge. Blue Ridge is the only company in the pyramid actively engaged in managing a general investment portfolio.

While both American Cities and Blue Ridge formerly had outstanding senior securities, which accentuated the leverage in the Central holding company pyramid, at the present time their capitalization consists exclusively of common stock with the minor exception of a small bank loan in the case of Blue Ridge. American Cities' Blue Ridge holdings, together with a large block of North American stock, account for about 70% of its net assets of about $26,000,000.

It is clear that the value of the assets of Central (other than contingent assets) is in excess of the amount of the claims of its creditors now outstanding but is less than the amount of these claims plus the interest of all of Central's preferred stockholders, including both the 7% preferred stock and the 6% preferred stock. It is even clearer that the claims of the common stockholders (if the contingent assets of Central be disregarded) are many millions of dollars under water.

It is not necessary to describe at length the plan of reorganization submitted by the trustees and approved by the court below, as it is fully set forth in the report of the Securities and Exchange Commission. Briefly stated, it provides for the liquidation of American Cities, largely by distribution in kind, the merger of Blue Ridge, and the formation of an open-end investment company to take over the assets now held by Central and those to be transferred to it by Blue Ridge. Thus, the present three-company pyramid will be replaced by a single investment company, with a single class of common stock. The reorganized company will be open-ended after an initial time lag.

Stock in this open-end investment company at underlying asset value is to be awarded to debenture holders for the amount of the debentures held by them with interest and 7% preferred stockholders for the face amount of the stock with accrued dividends. As the stock in the reorganized corpora-

tion is not to be redeemable for a sixty day period, the debenture holders are given a stock bonus of not exceeding 5% for the risk involved and the 7% preferred stockholders a bonus not exceeding 2½%. If there is any remaining stock of the reorganized corporation, it is to be distributed first to the 6% preferred stock and then to the common stock. Contingent assets, consisting principally of lawsuits against Harrison Williams and others (provision is made for further prosecution of this litigation), will be retained by the trustees and any realization therefrom will be distributed to the stockholders in the priority indicated, that is, first to the 7% preferred if not already paid off, then to the 6% preferred and finally to the common stock.

■ A number of objections have been made to the plan. Many of these objections have so little merit that nothing need be said with regard to them in addition to what has already been said by the Commission and the court below. Thus the contention of appellant Chase, who owns a small block of common stock recently acquired at a price insignificant in comparison with the magnitude of the interests here involved, that the reorganization should be deferred until the litigation against Harrison Williams shall be terminated, is without merit. As was well said by the Commission: "To request delay when immediate reorganization is practicable is to disregard the rights of creditors, as well as senior stockholders, * * * and to continue to subject them to the risk of loss." Certainly, the creditors and senior stockholders are entitled to a reasonably prompt disposition of their claims.

■ Equally without merit is the contention that the common stockholders should be allowed to subscribe new capital. It is clear that they have no interest remaining in the corporation, except a very remote one dependant upon the amount recovered in the pending litigation, and this is fully preserved to them under the trustees' plan. There is no point in considering the plans offered by the debtor and the stockholders' committees, all of which involved the perpetuation of the three-tier holding company structure and are otherwise objection-

able for reasons which the Commission has very clearly pointed out.

█ After the Commission has recommended a plan and it has been approved by the District Court, it is not the proper function of this court to consider whether other plans which have been rejected might not have as much or more merit. They are relevant only to the extent that they may throw light upon the reasonableness of the plan which the District Court has approved.

With these matters out of the way, the four main contentions made by appellants remain for our consideration: (1) that the proposed plan is a plan of liquidation and not a plan of reorganization; (2) that the plan is objectionable because of the manner in which the assets are to be valued; (3) that the plan is unfair and inequitable because the 7% preferred stockholders are allowed full liquidation preference; and (4) that the allowance of a bonus to debenture holders and preferred stockholders is not justified.

### (1) A Plan of Reorganization Is Involved.

█ The contention that the plan is one of liquidation rather than reorganization is based upon the fact that the reorganized company is to be an open-end investment company, in which the stockholders will have the right to surrender their stock for cash on the basis of its value when judged by the value of assets owned by the company. There is no basis for the contention that such a reorganization is a liquidation. Open-end investment companies, are well known and have certain distinct advantages, one of which is that their stock usually sells for its approximate value when measured by underlying assets whereas the stock of closed-end investment companies frequently sells on the market at considerably less than its value as judged by this standard. There is no reason to think that the reorganized corporation will not go forward as other corporations of that type have done and are doing. This is just the sort of matter as to which the Securities and Exchange Commission is best qualified to judge; and no

good reason is suggested which would warrant the courts in substituting their judgment as to this for the expert judgment of the Commission.

█ Even if the plan be one which will lead to the eventual liquidation of the reorganized company, it is not to be condemned for that reason. On the contrary, it is well recognized that eventual liquidation may be a proper purpose of reorganization. See Cary "Liquidation in Reorganization", 60 Harvard Law Review 173, 180; Collier on Bankruptcy, 14th Ed., par. 10.02, p. 3451; Country Life Apartments v. Buckley, 2 Cir., 145 F.2d 935; Matter of Lorraine Castle Apartments Bldg. Corp., Inc., D.C., 53 F.Supp. 994, affirmed 7 Cir., 149 F.2d 55, certiorari denied Lorraine Castle Apartments Building Corp. v. Mackieurch, 326 U.S. 728, 66 S.Ct. 35, 90 L.Ed. 432. As was said by Judge Lindley, speaking for the 7th Circuit Court of Appeals in the case last cited, 149 F.2d at page 58:

"Appellant insists that a plan of reorganization may not properly contemplate a sale of the debtor's property. Section 216 (10) of the Bankruptcy Act, 11 U.S.C.A. § 616 (10), provides that a plan of reorganization 'shall provide adequate means for the execution of the plan, which may include: the retention by the debtor of all or any part of its property; the sale or transfer of all or any part of its property to one or more other corporations theretofore organized or thereafter to be organized; the merger or consolidation of the debtor with one or more other corporations; the sale of all or any part of its property, either subject to or free from any lien, at not less than a fair upset price and the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein.'

"Here we find express authority for a plan of reorganization which contemplates the sale of all or any part of its property either free or subject to any lien at not less than a fair upset price. We know of no reason why, inasmuch as Congress has granted authority to approve a plan of such character, it should not be approved where it is found to be fair and feasible. Ob-

viously sale and distribution of the proceeds amount to liquidation, but it is none the less within the definition of reorganization permitted by the Act of Congress and is in accord with the remedial provisions enacted by Congress."

■ What is really accomplished by the plan is not the liquidation of Central, but the replacement of the existing three-tier structure (with the leverage therein inherent) by a new company with a single class of securities, common stock. Of course, if the stockholders of the new open-end company in sufficient numbers cash in their stock, something in the nature of a liquidation would be brought about. How many of these stockholders will do this, of course, lies in the realm of prophecy or conjectural speculation. Even so, it is not the purpose of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., to compel security holders in a business—particularly that of an investment company—to continue in that business, if those who become the owners of that business, under a fair plan or reorganization, desire otherwise.

### (2) Valuation of Assets.

■ Appellants complain because the assets of the corporation were not valued at "going concern" value to include such matters as probable enhancement in values of securities held, increase in dividends, investment of amounts now held in cash and government bonds, restoration of "leverage" through the borrowing of money and the earnings of skilled management in the purchase and sale of securities. Questions of valuation are questions of fact, as to which the informed judgment of the Commission, approved by the District Judge, should not be lightly disregarded. All of the matters urged here were fully and carefully considered by the Commission, and we agree with it that the proper method of valuing the assets of an investment company such as this is not prospective earnings, as in the case of a manufacturing or railroad corporation, but the presently realizable market value of the securities on hand. In an ordinary business corporation, since the value of the unit as a whole often exceeds the value of the separate parts,

"going concern" value is very real, due to the unitary functioning of all the parts as a whole. We cannot state the matter better than did the Commission, when it said:

"Generally, the valuation of the assets of a business enterprise should be based primarily upon the reasonably prospective earnings derivable from the utilization of those assets. In this case, however, the assets of the debtor and its subsidiaries consist of marketable securities, none of which represents a controlling interest, and which are readily valued by reference to market quotations. Under the circumstances of this case, such method of valuation provides the most satisfactory basis for reorganization.

"In the case of investment companies, such as the debtor and its subsidiaries, which invest, reinvest, and deal in marketable securities, market prices are customarily used in appraising the value of their assets as well as their outstanding securities. Their capital consists of securities which are readily convertible into cash on the market, readily replaceable, and similarly available to anyone for cash at quoted prices. In an established open market the price of securities is in fact an appraisal arrived at by numerous interested parties dealing at arms' length. In practice substantial portfolio changes have been made from time to time by these companies. There are no fixed assets or equipment dedicated to a particular function; a specialized service is rendered only in the sense that the company offers diversification of investment and management of assets. In view of these characteristics, it is natural that net asset value based upon market prices should be the fundamental valuation criterion used by and large in the investment company field. In the absence of special circumstances, these characteristics constitute compelling reasons for considering net asset value as the primary measure of value as an investment company for reorganization purposes also."

As pointed out by the Commission, the net asset value results in a higher valuation than capitalization of earnings. When the earnings of the high year 1948 are taken as a base and are capitalized at the rates customarily used, a valuation of not ex-

ceeding $20,000,000 is obtained, whereas the asset value for that year was found to be $27,000,000. Capital gains from the sale and purchase of securities must be balanced against capital losses; and we agree with the Commission that they are too highly speculative to justify a valuation in excess of asset value. In this connection, we quote from the brief of the Commission:

"The Commission's report, adopted by the District Court, accepts the market value approach not only because of the inherent logic of this approach but because (a) it is the method of valuation in common use where parties deal at arms'-length, and (b) any fair application of the approach of capitalizing prospective earnings would lead to a lower valuation in view of past experience of the debtor and of the investment industry generally. This view had the support of Graham, the witness for the trustees and Sterling, the witness for the Kelly 6% Preferred Stockholders' Committee, agreed that a capitalization of prospective earnings was inappropriate for an investment company."

The same should be said with respect to the "special situation" regarding some of the stocks owned by the company and the proposition to restore "leverage", which is nothing more than a proposition to speculate on borrowed money at the risk of the senior security holders.

■ Obviously, the preference of the appellants for the complicated three-tier structure, with the resulting leverage, is understandable from the standpoint of their own self interest. Yet this certainly did not require the District Judge (or the Commission) to find that the plan of the trustees was not both fair and feasible. The standards of the Bankruptcy Act, §§ 216 (12) (b), 221 (2), 11 U.S.C.A. §§ 616 (12) (b), 621 (2), impose upon the judge who is considering a proposed plan of reorganization, a clear duty to curb against an unduly complex and unsound security structure for the reorganized company. Clearly these standards do not permit the new company to retain all the complexities and speculative features of the old. It is not without importance, too, that the plans proposed by appellants, for the purpose of maintaining leverage, fall below the minimum standards of conservatism prescribed in § 18 of the Investment Company Act of 1940, applicable to new promotions.

(3) Liquidation Preference of the 7%
Preferred Stock.

■ The 7% preferred stock provides that the holders thereof shall be entitled to receive cash to the amount of the par value and accrued dividends in case of "liquidation, dissolution or winding up of the corporation, whether voluntary or involuntary." We think that, from the standpoint of these stockholders, the old corporation is being virtually dissolved and wound up and that a new corporation is being created as a result of the reorganization. Consequently these preferred stockholders are entitled to the liquidation preference for which their stock provides. The rule is thus stated by the Commission in the Portland Electric Power Company case (16 SEC 239 at 243): "Chapter X of the Bankruptcy Act provides for judicial confirmation of a plan of reorganization if 'the plan is fair and equitable, and feasible'. That the 'fair and equitable' standard requires strict adherence to the 'absolute priorities' doctrine cannot be questioned, and the manner of applying absolute priorities in bankruptcy cases is well settled. In cases of this kind, the claims of creditors must be regarded as matured claims, and must be satisfied in full as to principal and interest before anything of value can be allocated to any class of stock. Similarly, in cases of this kind, the claims of a senior class of preferred stock (including dividend arrears, if any) must be regarded as matured, and nothing of value may be allocated to a class junior thereto unless the liquidation preferences of the senior class are satisfied in full."

The question was thoroughly considered by the Court of Appeals of the Ninth Circuit when the reorganization of the Portland Electric Power Co. was before that court. 162 F.2d 618. In holding that prior preference stockholders were entitled to

dividends computed to the date of payment, the court, 162 F.2d at page 622, said:

"Applying the 'fair and equitable' standard to controversies among stockholders, the Supreme Court has held that, where the corporate charter so provides, the courts must recognize the 'full priority' of senior stockholders. In the Otis case [Otis & Co. v. Securities and Exchange Comm.], supra, 323 U.S. [624], at page 634, 65 S.Ct. [483], at page 488 [89 L.Ed. 511] the court said:

" 'Like the bankruptcy and reorganization statutes, the Public Utility Holding Company Act [15 U.S.C.A. § 79 et seq.] in providing that plans for simplification be "fair and equitable," incorporates the principle of full priority in the treatment to be accorded various classes of security interests. This right to priority in assets which exists between creditors and stockholders, exists also between various classes of stockholders. When by contract as evidenced by charter provisions one class of stockholders is superior to another in its claim against earnings or assets that superior position must be recognized by courts or agencies which deal with the earnings or assets of such a company. Fairness and equity require this conclusion.'

\* \* \* \* \* \*

"Again, we have noted that there is an analogy between the rights of senior and junior creditors and those of senior and junior stockholders. Otis & Co. v. Securities & Exchange Commission, supra. 'Where in the administration of the affairs of an insolvent corporation there are claims of different rank, the holders of prior claims are entitled to interest to the time of payment, even though the payment thereof may deprive the holders of subsequent claims of any participation in the funds of the bankrupt.' In re Deep Rock Oil Corporation, 10 Cir., 113 F.2d 266, 269, certiorari denied [Standard Gas & Electric Co. v. Taylor], 311 U.S. 699, 61 S.Ct. 138, 85 L.Ed. 453, and the cases there cited.

"By a parity of reasoning, senior stockholders should be entitled to dividends *to the time of payment,* even though the payment thereof may deprive the holders of junior stock of any participation in the funds of the reorganized corporation."

And Circuit Judge Garrecht concluded his opinion in this case with the observation: "Both on reason and authority, therefore, we hold that the 'bundle of rights' of the prior preference stockholders herein includes accrued dividends from April 3, 1939, when the petition was filed, to October 31, 1945, the date as of which the assets of the debtor were valued, and the claims against it calculated." 162 F.2d at page 624.

See, also, proceedings for reorganization of Porto Rican American Tobacco Co., 7 S.E.C. 301, at 314, the plan of which was approved by the Court of Appeals of the Second Circuit, 112 F.2d 655; In re Warren Bros. Co., D.C., 43 F.Supp. 173; and In re Childs Co., D.C., 69 F.Supp. 856. In the case last cited, Judge Conger, after referring to provisions which were claimed to give special value to the preferred stock, said: "Both the Trustee and the Securities and Exchange Commission agree, however, that notwithstanding these special aspects of the preferred stock, the sum of the par value of the preferred stock and the accumulated dividends measures the extent of the preferred stockholders' claim; and that an allocation of new common stock to them based upon the proportion that this sum bears to the total value of the enterprise is an adequate recognition of their entire 'bundle of rights.' With this conclusion I agree." 69 F.Supp. 858.

Reorganization in bankruptcy stems from the old reorganization in equity, Campbell v. Alleghany Corporation, 4 Cir., 75 F.2d 947, in which contractual priorities were strictly safeguarded. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Northern Pac. Ry. Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. In reorganization cases under section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, the right of preferred stockholders to preferential treatment to the amount of the face of preferred stock and accrued dividends was recognized. In re Chicago, Great Western R. Co., D.C., 29 F. Supp. 149, 159-160; Chicago & Eastern Illi-

nois R. Co., 230 I.C.C. 199, 231-232. And the same was true of reorganization under 77B, 11 U.S.C.A. § 207. In re National Food Products Corp., D.C., 23 F.Supp. 979, 981-982; In re Utilities Power & Light Corp., D.C., 29 F.Supp. 763, 769-770; Standard Gas & Electric Co. v. Deep Rock Oil Corp., 10 Cir., 117 F.2d 615.

■ We do not think that the rule applicable in reorganizations under the bankruptcy act that the liquidation preference of preferred stock is to be recognized to the full amount of the face value of the preferred stock plus accrued dividends, has been in any way modified by what was decided in Otis & Co. v. Securities and Exchange Comm., 323 U.S. 624, and Securities and Exchange Comm. v. Central-Illinois Securities Corporation, 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836. Those cases dealt with dissolutions under the Holding Company Act and proceeded upon the theory that where a going corporation was dissolved by act of Congress as a matter of public policy, it was not intended that the rights of preferred stockholders should be matured as in case of reorganizations in proceedings instituted under existing laws. The Supreme Court in the first of these cases thus gave the reason of the rule, 323 U.S. 637–638, 65 S.Ct. 490: "We think, however, the charter preference is inoperative in simplification under section 11(b) (2). The provision having been adopted in 1929, six years prior to enactment of the Public Utility Holding Company Act, a 'simplification' under this Act, having as an incident to it the dissolution of one company in a holding company system, was not an anticipated 'liquidation' within the meaning of Power's charter provision. Enforcement of an overriding public policy should not have its effect visited on one class with a corresponding windfall to another class of security holders. * * * Where pre-existing contract provisions exist which produce results at variance with a legislative policy which was not foreseeable at the time the contract was made, they cannot be permitted to operate. Compare New York Trust Co. v. Securities & Exchange Commission, 2 Cir., 131 F.2d 274; In re Laclede Gas Light Co., D.C., 57 F.Supp. 997. The reason does not lie in the fact that the business of Power continues in another form. That is true of bankruptcy and equity reorganization. It lies in the fact that Congress did not intend that its exercise of power to simplify should mature rights, created without regard to the possibility of simplification of system structure, which otherwise would only arise by voluntary action of stockholders or, involuntarily, through action of creditors. We must assume that Congress intended to exercise its power with the least possible harm to citizens." (Italics supplied.)

In the case of Securities and Exchange Comm. v. Central-Illinois Securities Corporation, 338 U.S. 96, 130-131, 69 S.Ct. 1377, 93 L.Ed. 1836, the Engineers' Public Service case, the Supreme Court expressly held that the equitable equivalent which would satisfy the "fair and equitable" rule in dissolutions under the Holding Company Act is not "invariably" the charter liquidation preference "as it is in the case of liquidations or reorganizations brought about through the action of creditors or stockholders." Referring to the decision in the Otis case the court in this connection said, 338 U.S. at pages 130–131, 69 S.Ct. at page 1395:

"Relying on the legislative history of the Act, 323 U.S. at pages 636–637, 65 S.Ct. at pages 489–490, and upon the fact that the charter provision was not drafted in contemplation of the legislative policy embodied in the Act, [id.] 323 U.S. at pages 637–638, 65 S.Ct. at page 490, we held that the Commission had not erred in its method of valuation. By this ruling we rejected the easier solution of permitting liquidations or reorganizations compelled by the Act to mature charter rights and thus to shift investment values from one class of security holder to another.

"In so ruling, this Court did not abandon the 'absolute priority' standard in so far as embodied in the requirement that the plan be 'fair and equitable.' That standard requires that each security holder be given the equitable equivalent of the rights surrendered, but the equitable equivalent is not invariably the charter liquidation prefer-

ence, as it is in the case of liquidations or reorganizations brought about through the action of creditors or stockholders. The principle of the Otis case is that the measure of equitable equivalence for purposes of simplification proceedings compelled by the Holding Company Act is the value of the securities 'on the basis of a going business and not as though a liquidation were taking place.' 323 U.S. at page 633, 65 S.Ct. at page 488."

In commenting on the decision in the case last discussed Professor Dodd said (63 Harvard Law Review 305): "Reorganizations under the Bankruptcy Act are substitutes for liquidation, and there seems no reason to doubt that in such reorganizations liquidation preferences must be treated as matured, as bondholders' claims to principal must be under Case v. Los Angeles Lumber Products Co. [308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110]."

In another reorganization under Chapter X, Oscar Nebel Co., Inc., the District Court for the Eastern District of Pennsylvania, on May 7, 1940, approved a plan as fair and equitable which fixed the claim of preferred stockholders as equivalent to their liquidation preference including accumulated dividends. The common stockholders were excluded from any participation. Upon appeal by a common stockholder, the Circuit Court of Appeals unanimously affirmed the order of the District Court without opinion. In re Oscar Nebel Co., Inc., 3 Cir., 115 F.2d 141.

To deny the 7% preferred stockholders the equitable equivalent of their liquidation preference in the instant reorganization would, we think, subvert the basic doctrine of absolute priority among competing interests and would render somewhat illusory the charter provisions for a preference to these stockholders. Central in its brief states: "Of course, if the Debtor was insolvent and was being liquidated in such a proceeding, the liquidation preferences of the Preferred Stock would be matured." This, of course, is quite beside the mark. Where the debtor corporation is insolvent, only creditors participate, the stockholders get nothing.

We have carefully examined the cases cited by appellants. These cases do not support their contention that liquidation preferences of preferred stock, including dividend arrearages, are not matured on a bankruptcy reorganization. We think a contrary conclusion may be fairly deduced from the cases which we have cited and discussed.

(4) The Question of the Bonus.

The bonus is provided in the plan for the holders of debentures and the 7% preferred stock because the holders of these securities are required under the plan to accept common stock, which they cannot convert into cash for a period of sixty days. There is a possibility that they may sustain loss during this period as the result of market fluctuations; and it is well settled that they must be compensated for the risk that they are thus required to assume. Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. Just what amount constitutes a fair compensation for this risk is quite difficult to state or appraise. No valid reason, however, is offered by the appellants that would justify us in setting aside the action of the Commission and the judge below, reached in their informed discretion, with respect to this matter.

Of course, no security holder should receive anything beyond the fair equivalent of his present rights, including his existing priority provision, and that is all he receives under the Plan. The new capital structure of Central eliminates completely the valuable priority rights of the debenture holders over all classes of stock, and, in like manner, the priority of the 7% preferred stock over junior stock; for, under the Plan, the debenture holders and the 7% preferred stockholders receive only common stock. As the trustees' brief puts it:

"In short, the Plan provides no *qualitative* recognition of the absolute-priority and full-compensation doctrines laid down by the Supreme Court in construing the 'fair and equitable' requirements of the Act.

"Instead, the Plan affords *quantitative* reflection of present priorities through the device of a step-up of the debenture claim

and a smaller step-up of the 7% preferred stock claim. Such step-up cannot, under the Plan, exceed 5% of the debenture claim or 2½% of the 7% preferred stock claim. By this quantitative step-up, the Plan compensates present senior security holders for the complete and final elimination of their priority rights as a result of the one-class capital structure of the Reorganized Company. Without such a step-up, the Plan would plainly violate the Supreme Court's absolute-priority and full-compensation doctrines * * *."

In Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 318 U.S. 523, 565-566, 63 S.Ct. 727, 749, 87 L.Ed. 959, Mr. Justice Douglas said: "It is sufficient that each security holder in the order of his priority receives from that which is available for the satisfaction of his claim the equitable equivalent of the rights surrendered. That requires a comparison of the new securities alloted to him with the old securities which he exchanges to determine whether the new are the equitable equivalent of the old. But that determination cannot be made by the use of any mathematical formula. Whether in a given case senior creditors have been made whole or received 'full compensatory treatment' rests in the informed judgment of the Commission and the District Court on consideration of all the relevant facts." See, also, Standard Gas & Electric Co. v. Deep Rock Oil Corporation, 10 Cir., 117 F. 2d 615, certiorari denied 313 U.S. 564, 61 S. Ct. 842, 85 L.Ed. 1523; In re Midland United Co., D.C., 58 F.Supp. 667; Id., 3 Cir., 141 F.2d 692; Matter of Inland Gas Corporation, D.C.E.D.Ky.1949, 92 F.Supp. 810.

For the reasons above stated, the order of the court below dated April 24, 1950, approving the plan of reorganization will be affirmed and so also will the order of May 24, 1950, directing the trustees to vote the stock held by them in American Cities for the liquidation of that corporation in accordance with the Plan. Our judgment will dissolve the stay of the order of May 24 so that the dissolution of American Cities may not be held up pending the issuance of our mandate or application in the Supreme Court for certiorari. If appellants desire a further stay of the order, they can apply to the Supreme Court.

Affirmed.