278 F.2d 402
 George SPITZER, Henry Miller, Sr., Ellis & Co., and Gresham Street Nominees, Ltd., Appellants,
v.
Herman T. STICHMAN, Trustee of Hudson & Manhattan Railroad Company, Debtor, et al., Appellees.
In the Matter of HUDSON & MANHATTAN RAILROAD COMPANY, Debtor.
In Proceedings for the Reorganization of a Corporation Pursuant to Chapter X of the Bankruptcy Act.
 No. 165.
 Docket 25840.
 United States Court of Appeals Second Circuit.
 Argued February 11, 1960.
 Decided May 11, 1960.
 
 1
 Davis & Heffner, New York City (Benjamin Heffner and David M. Gerstein, New York City, on the brief), for appellants.
 
 
 2
 McGoldrick, Dannett, Horowitz & Golub, New York City (William W. Golub, Myron S. Isaacs and Warren A. Weiss, New York City, on the brief), for trustee of debtor, appellee.
 
 
 3
 Kelley, Drye, Newhall & Maginnes, New York City (Frank H. Heiss and Albert A. Eustis, New York City, on the brief), for Hanover Bank, as trustee under first lien and refunding mortgage of debtor, appellee.
 
 
 4
 Davis, Polk, Wardwell, Sunderland & Kiendl, New York City (Samuel F. Pryor, III, New York City, on the brief), for Morgan Guaranty Trust Co. of New York, trustee under mortgage dated Dec. 29, 1906 of debtor, appellee.
 
 
 5
 Percival E. Jackson and Theodore N. Tarlau, New York City, for first lien and refunding mortgage bondholders, appellees.
 
 
 6
 Aranow, Brodsky, Bohlinger, Einhorn & Dann, New York City, for Crockett Committee for first lien and refunding mortgage bondholders, appellees.
 
 
 7
 Harold P. Seligson and Morton E. Yohalem, New York City, for Haas Committee for first lien and refunding mortgage bondholders, appellees.
 
 
 8
 House, Grossman, Vorhaus & Hemley and Edward M. Garlock, New York City, for petitioning creditors, appellees.
 
 
 9
 James S. Kleinman, New York City, for first lien and refunding mortgage bondholders, appellees.
 
 
 10
 Thomas G. Meeker, Gen. Counsel, David Ferber, Asst. Gen. Counsel, Washington, D. C., Richard V. Bandler, Sp. Counsel, New York City, and Melvin Katz, Atty., Washington, D. C., for Securities and Exchange Commission, appellee.
 
 
 11
 Before MOORE, Circuit Judge, and SMITH and HERLANDS, District Judges.
 
 
 12
 HERLANDS, District Judge.
 
 
 13
 This is an appeal by four common stockholders from an order of the district court approving the trustee's amended plan of reorganization of the debtor, Hudson & Manhattan Railroad Company, pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq.
 
 
 14
 The problem of valuation presented in the reorganization proceeding was complicated by the possibility that some part or all of the debtor's commuter railroad plant might be purchased or condemned by a public authority at some indeterminate time in the future, at a price many times its present value, when such value is considered apart from the prospect of such a public takeover.
 
 
 15
 In his plan, the trustee concluded inter alia: "The present value of the entire enterprise, after giving full effect to assets, earnings, and prospects of sale of the railroad property to a public authority, is less than enough to satisfy in full the claims of the creditors of the Debtor." The plan, therefore, excludes both preferred and common stockholders from participation. The "present value" was not assigned a dollar amount. In an advisory report filed pursuant to section 173 of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 573, the Securities and Exchange Commission approved the trustee's plan in all pertinent respects and specifically concluded that the plan is fair and equitable in excluding the interests of the stockholders.
 
 
 16
 In approving the plan, the district court found that the debtor is insolvent; that neither preferred nor common stockholders have an interest in its assets; and that the highest price likely to be realized on public takeover of the railroad is forty million dollars. Adding this amount to the seventeen million dollars at which the real estate assets are valued, the court concluded that the maximum "potential value" of the enterprise thus obtained is less than the aggregate claims of all creditors.
 
 
 17
 Appellants argue that the court's finding respecting the maximum amount realizable on public acquisition of the railroad is based on evidence which is incompetent and insufficient, and that the debtor may in fact realize enough to satisfy the claims of all creditors, with something left over for preferred and common stockholders. Appellants contend that the plan, which excludes them, is therefore not "fair and equitable," within the meaning of section 174 of Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 574. To cure this "defect," appellants proposed (and the district court rejected) an amendment of the plan which would give the stockholders contingent interest certificates, clearly marked as such, to be called "Class C Common Stock." The holders of this "Class C Common Stock" would be entitled to any excess of the proceeds of sale of the debtor's railroad properties after senior security holders and creditors were satisfied in full.
 
 
 18
 The Supreme Court has given content and fixed meaning to the explicit statutory standard of fairness and equity by its full and absolute priority rule. In so far as it is pertinent here, that rule prescribes that stockholder interests shall not participate in a reorganization unless the debtor is solvent. Its assets must be valued at an amount in excess of the aggregate of the allowed claims of creditors. Before stockholders may participate at all without a fresh contribution by them "in money or in money's worth," creditors must be fully compensated in cash or securities of the value of their claims, both face amount and interest. Case v. Los Angeles Lumber Products Co., Ltd., 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110; Consolidated Rock Products Co. v. Du Bois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. Even contingent participation of stockholders takes something that creditors would otherwise receive and is inadmissible in the usual case of an insolvent debtor. See Consolidated Rock Products Co., supra, 312 U.S. at page 529, 61 S.Ct. at page 686;[1] In the Matter of Central States Electric Corporation, 30 S.E.C. 680, 728-730 (1949).
 
 
 19
 The instant situation is some-what unique in that a substantial realization on assets may occur in a single transaction. Fairness and equity permit an arrangement which makes the treatment of the various interests depend as little as possible on the relative timing of that transaction and the reorganization. An acceptable means of minimizing this factor of chance is to allow junior security holders, who otherwise would have no interest, to retain a contingent interest so that they may participate if the proceeds of the transaction exceed the claims of senior interests. See Country Life Apartments v. Buckley, 2 Cir., 1944, 145 F.2d 935, 936 (contingent proceeds of sale of assets); Central States Electric Corporation v. Austrian, 4 Cir., 1950, 183 F.2d 879, 882, certiorari denied 340 U.S. 917, 71 S.Ct. 350, 95 L.Ed. 662 (contingent proceeds of pending lawsuits).
 
 
 20
 Yet, not every present interest should necessarily be given a place in the queue. At some point, the following countervailing policies dictate that there must be a cut-off beyond which junior interests must be excluded. (1) To the extent that full compensation for their claims depends upon realization of uncertain prospects,[2] seniors must be compensated with the opportunity to participate in better-than-expected prosperity.[3] Otherwise, seniors would be victims of a "heads we win, tails you lose" bargain.[4] (2) Creation and distribution of a security practically certain to be worthless is contrary to the public interest. Such a security would be highly speculative, deceptive, and fraught with danger to investors.[5]
 
 
 21
 The district court determined the cutoff point by finding the maximum figure reasonably likely to be realized on a sale of the railroad to a public agency. Finding that this figure, added to the value of the real estate properties, yielded a maximum potential value which was still below the aggregate claims of creditors, the court concluded that the stockholders should have no participation in the reorganization, even on a contingent basis. This approach to the problem is consonant with fairness and equity. Cf. Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co., 1943, 318 U.S. 523, 536-538, 63 S.Ct. 727, 87 L.Ed. 959.
 
 
 22
 The debtor is a corporation organized in 1906, pursuant to the laws of the States of New York and New Jersey, by the merger and consolidation of three predecessor corporations. It is engaged in two types of business activities: the ownership and operation of the Hudson Tubes, an interurban electric railroad; and the ownership of certain real estate in downtown Manhattan, New York City, principally the Hudson Terminal Buildings, erected in 1907 and 1908.
 
 
 23
 The debtor's railroad system provides passenger service only, under the Hudson River, between stations in downtown and midtown Manhattan and stations in Jersey City and Hoboken. In conjunction with the Pennsylvania Railroad, the debtor operates a joint rapid transit service between Hudson Terminal and Newark. It has two uptown and two downtown tubes under the Hudson River, and about eight miles of double-track main lines. At the time reorganization proceedings began, the debtor had about two hundred motorized passenger cars, most of them acquired in the years 1908 through 1911, and never overhauled.
 
 
 24
 The district court found that the financial difficulties of the debtor stem from an initial over-capitalization with debt securities, combined with a progressively increasing squeeze on the railroad operations from rising operating expenses and loss of passengers to publicly financed vehicular crossings of the Hudson River by bridge and tunnel.
 
 
 25
 As of August 11, 1954 (the date these proceedings began by the filing of an involuntary petition in bankruptcy), the debtor had $46,339,405 in mortgage bonds outstanding, of which some $29,525,405 were First Mortgage and Refunding Mortgage Bonds and the balance of some $16,814,000 were Adjustment Income Mortgage Bonds. In addition, the debtor had outstanding 52,500 shares of 5% non-cumulative preferred stock, $100 par value, and approximately 400,000 shares of $100 par value common stock.
 
 
 26
 As of December 31, 1959, the aggregate of the claims of all creditors was about $66,825,000. Interest continues to accrue upon the bonds in the amount of $2,128,000 per year at coupon rates. Thus, counting the claims of creditors and the liquidation rights of preferred stockholders, there were, as of December 31, 1959, claims in excess of $72,000,000 senior to those of the appellant-common stockholders.
 
 
 27
 The trustee's plan, recommended by the SEC and approved by the district court, is based upon the following premises: (1) that the debtor is insolvent in that the value of its assets is less than the aggregate allowable claims of creditors; (2) that, apart from the prospect of a sale of the railroad to a public agency, the value of the assets is less than the aggregate amount of the senior bonds (the First Mortgage and Refunding Mortgage Bonds); and (3) that there are free assets as to which general creditors and, to the extent of their deficiency claims, bondholders are entitled to participate.
 
 
 28
 The debtor will continue its corporate existence as a Real Estate Company, and will hold and operate the real estate assets. A separate Railroad Company, to be a wholly-owned subsidiary of the Real Estate Company, will hold the railroad assets and will operate the road. In addition, the Railroad Company will receive $500,000 from the debtor, estimated to be its working capital requirement for two years. This separation of railroad and real estate functions will facilitate sale of the railroad or discontinuance of its operation. For two years following the date of consummation, the Real Estate Company will be empowered to issue up to $2,500,000 of new Prior Lien obligations. It will also have the capital and debt structure indicated below.
 
 
 29
 Senior (First Mortgage and Refunding Mortgage) bondholders have already received $125 cash per $1,000 of original principal amount. In addition, they will receive $340 of twenty-year 6% first mortgage bonds ("New Bonds") per $1,000 of original principal amount and 20 shares of Class A stock per $1,000 of original principal amount. This will be in satisfaction of their claims to principal and accrued interest.
 
 
 30
 Junior (Adjustment Income Mortgage) bondholders, in entire satisfaction of their claims for principal and accrued interest, will receive all of the Class B stock at 3½ shares for each $1,000 of original principal amount.
 
 
 31
 General unsecured creditors will be paid 10% of claims allowed.
 
 
 32
 The assets of the Railroad Company will be unencumbered. The mortgage liens provided for will be on the assets of the Real Estate Company, other than its stock in the Railroad Company.
 
 
 33
 The Class A and the Class B stock of the Real Estate Company will represent the same equity per share in the assets and earnings of the Real Estate Company and in the proceeds up to $17,000,000 of any sale of the stock or property of the Railroad Company. Any such proceeds in excess of $17,000,000 will be distributed among the holders of the Class A and Class B stock according to a formula calculated to satisfy the claims of the junior bondholders, once the claims of the seniors have been satisfied. Thus, junior bondholders are to receive a contingent interest in such proceeds.
 
 
 34
 The district court made a detailed summary of financial data for the eight-year period 1951 through 1958. The average annual net income of the debtor before bond interest was $881,000 — less than forty percent of interest requirements on the bonds outstanding. The railroad operation suffered an operating loss after depreciation in every year but one, averaging $307,000. The average annual operating income from real estate operations was $1,169,000.
 
 
 35
 The district court found that the reasonable value of the assets to be retained by the Real Estate Company is $17,000,000. Appellants do not contest that valuation.
 
 
 36
 The district court found that, in the reasonably foreseeable future, the Railroad Company will operate at a loss and that, accordingly, there is no basis for a valuation by capitalization of reasonably foreseeable earnings. Basing its finding primarily on evidence of liquidation value, it found that the Railroad Company would be worth $3,500,000, apart from the prospect of a sale of the railroad to a public agency.
 
 
 37
 The court further found that the most that might be realized on such a sale is $40,000,000. In order that the appellant-common stockholders might participate in the reorganization, a value of approximately $55,000,000 would have to be found for the Railroad Company.
 
 
 38
 In appraising the significance of the prospect of public take-over, the uncertainties are: (1) the degree of likelihood that the contingency will occur; (2) when it will occur; (3) how much of the debtor's facilities are likely to be acquired, and (4) at what price.
 
 
 39
 From the record it appears possible that, at some indeterminate time in the future, a bi-state agency, probably one not yet in existence, might acquire and integrate into a bi-state loop the debtor's downtown service, including the two tunnels there utilized.
 
 
 40
 The States of New Jersey and New York created the Metropolitan Rapid Transit Commission (hereinafter MR TC) to study and report, inter alia, upon the problems of mass transportation between New Jersey and New York City. In its 1958 report, the Commission advanced "four basic transit plans." The plan it favored involves an independent bi-state loop and two new tunnels under the Hudson River. It would utilize the facilities of the debtor's downtown service; however, the uptown service would be discontinued. The Commission's second and third plans provide for similar use of the debtor's facilities. Only its fourth and least favored plan would also include the facilities of the uptown service.
 
 
 41
 Legislation for the creation of a bi-state rapid transit district, recommended by the Commission, has been adopted by New York. Proposed legislation is still pending in New Jersey. The SEC concluded that "it cannot be predicted what the outcome of the program will be in so far as it relates to the Debtor's facilities."
 
 
 42
 The only evidence before the district court of the maximum price at which public acquisition is likely was the testimony of the trustee, Herman T. Stichman.
 
 
 43
 According to his testimony, Mr. Stichman, a lawyer, had handled a great many real estate operations and reorganizations in his private practice. As Commissioner of Housing of the State of New York for ten years, he had "had quite a bit to do" with real estate matters and governmental operations. Since his qualification as trustee of the debtor in 1954, Mr. Stichman had been operating head of the debtor's railroad and real estate businesses, and had concerned himself with the various aspects of its day-to-day activities. He had also familiarized himself with the operations of other transportation facilities in the New York-New Jersey metropolitan area. He had kept in close touch with the activities of the Metropolitan Rapid Transit Commission. He had met from time to time with its New York co-chairman, and quite often with the staff; and he had had discussions with some of the other members of the Commission. He had also discussed the work of the Commission with various public officials and private groups.
 
 
 44
 Mr. Stichman further testified that, although there had not been anyone authorized to negotiate on behalf of any public agency, he had had discussions respecting the proposed acquisition with state and municipal officials of both states, and with members of the MRTC and of the Port of New York Authority. Asked whether he had "discussed with public officials or others the price," he replied: "I have not discussed it. Suggestions have been made to me and I have, in several instances, indicated that if the thinking went along that line I thought a bargain could be struck."
 
 
 45
 As to his opinion of the maximum price likely to be realized, Mr. Stichman said: "I would say not to exceed $40 million, somewhere between $35 and $40 million. I may be a little optimistic."
 
 
 46
 Mr. Stichman explained that the price would depend in part upon the immediate availability of the debtor's facilities and the cost of the new tunnels which would have to be dug if the debtor's were not used. The MRTC had estimated that cost at $33,000,000, a figure which Mr. Stichman thought far too low. He testified:
 
 
 47
 "And I tried to balance off what it might cost them to dig a new tunnel with what I might get for my existing tunnels and how I could begin with that [in bargaining], and it was no more scientific than that."
 
 
 48
 On the basis of the above testimony, [174 F.Supp. 166.] the district court found that the "maximum potential value" was less than enough to satisfy the creditors in full and justify participation by the stockholders.
 
 
 49
 Appellants contend that the trustee's opinion testimony should not have been received in evidence, and that it is an incompetent basis for a finding for the asserted reason that the trustee did not qualify as an expert witness.
 
 
 50
 The competence of a witness to testify as to his opinion is largely within the discretion of the trial court; "its ruling thereon will not be disturbed unless clearly erroneous." Chateaugay Ore & Iron Co. v. Blake, 1892, 144 U.S. 476, 484, 12 S.Ct. 731, 732, 36 L.Ed. 510; United States v. Freundlich, 2 Cir., 1938, 95 F.2d 376, 380; United States v. Miller, 2 Cir., 1932, 61 F.2d 947, 950. See Wigmore on Evidence (3rd ed.) section 561, pp. 642-643.
 
 
 51
 In testing the competency of the witness to give opinion testimony with respect to the highest price which might be obtained from a sale of the railroad, it would have to appear to the trial court: (1) that he had knowledge of the property to be sold; (2) that he had knowledge of the various attendant circumstances and conditions which would affect the disposal of the property and determine the price; and (3) that he had the ability, by reason of his training and experience, to make a judgment which would be helpful to the court in determining the issue. See Wigmore on Evidence (3rd ed.) sections 711, 717, 1923, 1976.
 
 
 52
 The record shows that the witness met all three qualifications sufficiently to preclude a decision here that the district court was clearly in error in admitting and considering the testimony. It appears that Mr. Stichman had knowledge of the historical, political, economic and engineering factors which would affect and determine the price. His career had peculiarly fitted him for the judgment required. There cannot be more than a few men whose qualifications to supply this important evidence to the court even equal Mr. Stichman's.
 
 
 53
 The district judge had before him precisely the sort of situation in which competent opinion testimony of a disinterested witness, in whom the court has confidence, is the best and most reliable evidence on which to base a finding. It would have been impossible for the trustee to present to the court all the data upon which his opinion rested. See Wigmore on Evidence (3rd ed.) sections 1941, 1976. Some of that data involved observation of personalities and political situations. Even were it possible to present all the data, the district court would not be in as good a position to make an accurate finding without the witness's appraisal as with it. This, of course, is what makes opinion testimony valuable in the resolution of issues of fact. The evidence embodied in the trustee's testimony is no less competent and no less sufficient as a basis for a finding than that of a physician who has examined a patient and states his diagnosis.
 
 
 54
 This court considered the opinion of a trustee's expert an adequate basis for a finding of value in Trinity Buildings Corp. Preferred Stockholders Committee v. O'Connell, 2 Cir., 1946, 155 F.2d 327.
 
 
 55
 Condemnation of the railroad by a public agency is one of the possibilities contemplated. Appellants contend that the district court's valuation is without sufficient basis because the record contains no evidence of reproduction value.
 
 
 56
 Cost of reproduction or reconstruction is not invariably the criterion of value employed in condemnation proceedings. Matter of Huie, 1956, 2 N.Y. 2d 168, 173, 157 N.Y.S.2d 957, 139 N.E. 2d 140. It is unlikely that reproduction cost would be used in determining the amount of an award here. In United States v. Boston, Cape Cod & New York Canal Co., 1 Cir., 1921, 271 F. 877, the court held that, in a condemnation proceeding, evidence of the cost of reproduction is not to be considered as bearing upon value unless reproduction at that cost would be a reasonable commercial investment.
 
 
 57
 The only invariable principle of valuation in condemnation proceedings is that the award should reflect what the owner has lost; the criterion is not what the taker has gained. Roberts v. New York City, 1935, 295 U.S. 264, 282, 55 S.Ct. 689, 79 L.Ed. 1429. In the absence of a market value, this may properly be determined by what the property "brings in the way of earnings to its owner." Monongahela Navigation Co. v. United States, 1893, 148 U.S. 312, 328, 13 S.Ct. 622, 627, 37 L.Ed. 463. Where the property is incapable of producing earnings, "junk value" may be appropriate. See In re Elevated Railroad Structures, 1934, 265 N.Y. 170, 182, 192 N.E. 188, affirmed sub nom. Roberts v. New York City, supra. Authoritative discussions of methods of valuation in condemnation cases may be found in United States v. Miller, 1943, 317 U.S. 369, 373-375, 63 S.Ct. 276, 87 L.Ed. 336; Matter of Huie, supra; and Onondaga County Water Authority v. New York Water Service Corporation, Fourth Dept. 1955, 285 App. Div. 655, 661-663, 139 N.Y.S.2d 755.
 
 
 58
 In view of the foregoing, a collateral inquiry into the amount likely to be realized in a condemnation proceeding would not have resulted in a figure greater than $40,000,000. The elements of value which might have been considered in such an inquiry are not different from those which were considered for other purposes. We find no error.
 
 
 59
 Finally, appellants dispute the district court's conclusion that the plan is fair and equitable on the ground that it excludes the stockholders from participation in such appreciation in the value of the railroad as may result from discontinuation of competing railroad ferry service and tax relief, should such contingencies occur.
 
 
 60
 The district court made detailed findings with regard to the possibilities of ferry closings and tax relief. 174 F. Supp. at pages 164 to 166. It found that the likelihood that ferry closings would actually result in increased earnings was entirely speculative; and that attempts at such estimates would involve "assumptions which * * * are subject to so many contingencies and uncertainties, including action by various political bodies and regulatory agencies, as to render such estimates of little or no probative force."
 
 
 61
 The district court also noted the trustee's testimony that "I am not sure that it could be a profitable operation even if the ferries closed, but it might not necessarily be a losing operation."
 
 
 62
 The district court found that the incidence, extent and duration of tax relief was "wholly unpredictable."
 
 
 63
 The limit of our review is to say whether the method of valuation used by the district court and the figure which it found as the maximum value of the assets were "clearly erroneous." F. R.Civ.P., Rule 52(a), 28 U.S.C.A.; Trinity Buildings Corp. Preferred Stockholders Committee v. O'Connell, supra; Dudley v. Mealley, 2 Cir., 1945, 147 F.2d 268, certiorari denied 1945, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991; Meyer v. Dolan, 2 Cir., 1944, 145 F.2d 880, certiorari denied, 1945, 324 U.S. 867, 65 S.Ct. 916, 89 L.Ed. 1422; In re Frank Fehr Brewing Co., 6 Cir., 1959, 268 F.2d 170, 177. We hold that there was substantial and adequate support in the evidence for the finding regarding maximum potential sale price and for the finding that, in the reasonably foreseeable future, the railroad will operate at a loss. The district court's findings and conclusions have a solid foundation in fact and in law.
 
 
 64
 The order below must be and is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The Supreme Court said (312 U.S. at page 529, 61 S.Ct. at page 686) of cases in which stockholders are to participate in a plan of reorganization:
 "They [creditors] must receive, in addition, compensation for the senior rights which they are to surrender. If they receive less than that full compensatory treatment, some of their property rights will be appropriated for the benefit of stockholders without compensation. That is not permissible. The plan then comes within judicial denunciation because it does not recognize the creditors' `equitable right to be preferred to stockholders against the full value of all property belonging to the debtor corporation.'"
 
 
 [2]
 Judge Dawson found: "In the event of a sale, the price might be lower or higher than $17,000,000." 174 F.Supp. at page 169, Finding of Fact and Conclusion of Law No. 130
 
 
 [3]
 In Securities and Exchange Commission v. United States Realty Co., 1940, 310 U.S. 434, at page 452, 60 S.Ct. 1044, at page 1052, 84 L.Ed. 1293, the Court said:
 "* * * in any plan of corporate reorganization * * * any scaling down of the claims of creditors without some fair compensating advantage to them which is prior to the rights of stockholders is inadmissible."
 
 
 [4]
 Advising rejection of a proposal similar to that of appellants, the SEC observed in In the Matter of Central States Electric Corporation, 30 SEC 680, 729 (1949):
 "They [preferred stockholders who were entitled to the residual equity on reorganization] sustain all the loss if assets decline in value but get a fraction of any profit from an increase in value."
 See Blum, Full Priority and Full Compensation in Corporate Reorganizations, 25 U. of Chi.L.Rev. 417, 439 (1958).
 
 
 [5]
 In the case at bar, the SEC advised the district court that the proposal for a "Class C" stock should be rejected for this reason; and the district court so held. 174 F.Supp. at pages 151, 167, Findings of Fact and Conclusions of Law Nos. 114 and 115