### In the Matter of HUDSON & MANHATTAN RAILROAD COMPANY, Debtor.

United States District Court
S. D. New York.
April 28, 1959.

McGoldrick, Dannett, Horowitz & Golub, New York City, William W. Golub, Myron S. Isaacs, Herbert D. Schwartzman, Jerome Talbert, New York City, of counsel, for trustee of debtor.

Richard V. Bandler and Kiva Berke, New York City, for Securities and Exchange Commission.

Davis, Polk, Wardwell, Sunderland & Kiendl, New York City, Thomas O. G. FitzGibbon, Merlin E. Nelson, John A. Corry, New York City, of counsel, for Guaranty Trust Co. of New York.

Alan V. Lowenstein, Newark, N. J., George H. Callahan, Ludwig T. Smith, Newark, N. J., of counsel, for protective committee for holders of first mortgage bonds.

Arthur Miller, New York City, for holders of first mortgage bonds.

Kelley, Drye, Newhall & Maginnes, New York City, Frank H. Heiss, Albert A. Eustis, New York City, of counsel, for Hanover Bank.

Harold P. Seligson and Morton E. Yohalem, New York City, for protective committee for holders of first and refunding mortgage bonds.

Aranow, Brodsky, Bohlinger, Einhorn & Dann, New York City, Edward Ross Aranow, Lloyd I. Singer, I. Robert Rozen, New York City, of counsel, for Crockett protective committee for holders of first and refunding mortgage bonds.

Harold Herzstein, New York City, for protective committee for holders of first and refunding lien bonds.

Percival E. Jackson, New York City, Theodore N. Tarlau, New York City, of counsel, for holders of first and refunding mortgage bonds.

White & Case, New York City, for Prudential Life Ins. Co. of America.

House, Grossman, Vorhaus & Hemley, New York City, Edward M. Garlock, Leonard Hemley, New York City, of counsel, for holders of first and refunding mortgage bonds.

James Kleinman, New York City, for holders of first and refunding mortgage bonds.

Paul Kern, New York City, pro se.

Sanford Solarz, New York City, pro se.

Proskauer, Rose, Goetz & Mendelsohn, New York City, Jacob Imberman, New York City, Edward D. Cohen, Washington, D. C., of counsel, for Chemical Corn Exchange Bank.

Edward Endelman, New York City, Milton M. Unger, Newark, N. J., Daniel W. Blumenthal, New York City, of counsel, for Kohn protective committee for holders of adjustment income mortgage bonds.

Louis Kipnis, New York City, for protective committee for holders of adjustment income mortgage bonds.

Moses & Singer, New York City, Arnold A. Jaffe, Lyonel E. Zunz, New York City, of counsel, for Oscar Gruss & Son, holder of adjustment income mortgage bonds.

Charles Poletti, Hoffman, Buchwald, Nadel, Cohen & Hoffman, Buchman & Buchman, New York City, Charles Poletti, Bernard Buchwald, Charles D. Hoffman, Bernard Nadel, David Geldzahler, Milton Lang, New York City, of counsel, for holders of adjustment income mortgage bonds.

Roth & Riseman, New York City, Barrett G. Kreisberg, New York City, of counsel, for holders of adjustment income mortgage bonds.

Davis & Heffner, New York City, A. N. Davis, Benjamin Heffner, New York City, of counsel, for common stockholders.

Mulholland, Robie & Hickey, Washington, D. C., and Reilly, Curry & Gibbons, New York City, William Mahoney, Washington, D. C., Francis R. Curry, New York City, of counsel, for various labor organizations.

David D. Furman, Trenton, N. J., for State of N. J. and N. J. Bd. of Public Utility Comrs.

DAWSON, District Judge.

There is before the Court for its approval, pursuant to the provisions of the Bankruptcy Act, a plan of reorganization proposed by the Trustee in Bankruptcy, which appears to have the support of representatives of all of the creditor groups. The plan has been submitted to the Securities and Exchange Commission for its advisory opinion and the Commission has, with one exception hereinafter referred to, found the plan to be feasible and fair and equitable.

The Court is simultaneously herewith filing its findings of fact and conclusions of law, which summarize the plan and the facts found by the Court, which facts justify approval of the plan by the Court.

The only opposition to the plan expressed at the hearings on the plan comes from representatives of equity interest. The Court has found the Debtor to be insolvent (Finding No. 111) and on the basis of the evidence before the Court there was no other finding which could be made.

The argument of representatives of the stockholders is that they should get some type of security which would give them an interest in the property in the event that future developments in the commuter transportation industry around New York would justify a value greater than can reasonably be found to be the value of the Debtor's properties, or can reasonably be anticipated from earnings that now can be developed from such properties. The Court agrees thoroughly with the view of the Securities and Exchange Commission on this problem when that Commission stated:

"The amended plan provides no participation for preferred and common stockholders on the ground that the Debtor is insolvent. As may be noted from Table IV above, aggregate claims exceeding $65,000,000 would be required to be satisfied in full before any participation could be accorded holders of preferred and common stock. Clearly there is no basis on present valuation for any participation by these security holders. It has been urged, however, that some recognition be given to the possibility that a sale of the railroad properties will realize net proceeds sufficiently great to satisfy all creditors' claims and leave a balance distributable on account of stockholder interests. In light of the valuation of approximately $17,000,000 for the real estate properties, this would require net proceeds from liquidation of the railroad properties in excess of $48,000,000. We have noted previously that, on the most optimistic basis, the Trustee could not anticipate such a price. In our view, such a possibility is so remote as to be of no cognizable value. Moreover, to distribute securities in the nature of warrants or contingent interest certificates to stockholders in these circumstances would in our view create a highly deceptive and speculative security which would be injurious to the public interest and the interest of investors and would render the amended plan unfeasible."

The Securities and Exchange Commission has suggested that the plan be modified to provide for the selection of the initial boards of directors of the reorganized companies from among the nominees of the bondholders. I am advised that the Trustee is agreeable to this suggestion and that a proposed amendment

to the plan so providing will be submitted shortly. Such proposed amendment will be acceptable to the Court, keeping in mind, however, that the ability of the proposed directors and the propriety of their appointment must, in the final analysis, be determined by the Court.

The proposed plan is found by the Court to be fair and equitable. It is also feasible. The railroad company, which is to be established as a subsidiary of the real estate company, will have sufficient plant, equipment and resources to enable it to continue the railroad operations. However, candor would compel any person to admit that for the long range view we will have to look forward to governmental assistance, either in the form of tax relief, or otherwise, if the operations are to continue at the present rate. It is comforting to realize that the Governors of New York and New Jersey, and the legislatures of those two states, are cognizant of the fact that government subsidized forms of competitive commuter transportation have brought railroad commuter transportation to the brink of disaster. Various types of relief are now in the discussion stage. When overall plans are finally worked out there is no reason why the reorganized Hudson Tubes should not be a part of a revitalized commuter transportation network in this community.

The plan is approved. So ordered.

Findings of Fact and Conclusions of Law

1. The Trustee of Hudson & Manhattan Railroad Company, Debtor in reorganization proceedings pending in this Court pursuant to Chapter X of the Bankruptcy Act ("the Act"), 11 U.S.C.A. § 501 et seq., has filed an Amended Plan for the reorganization of the Debtor. Two proposed amendments suggesting modifications of the Trustee's Amended Plan have been filed by representatives of certain bondholders of the Debtor.

2. Hearings have been held on due notice to all security holders and creditors. Argument has been heard and memoranda filed. The Securities and Exchange Commission ("SEC") has filed its Report pursuant to Section 173 of the Act, 11 U.S.C.A. § 573. Full opportunity to be heard has been accorded to the security holders of and claimants against the Debtor, to the regulatory commissions having jurisdiction over the Debtor, and to all interested persons. The Trustee's Amended Plan, and the proposed modifications thereof, are now before the Court for approval.

### The Reorganization Proceedings

3. These proceedings were commenced on August 11, 1954, when three bondholders of the Debtor filed in this Court an involuntary petition for the reorganization of the Debtor pursuant to Chapter X of the Act. It alleged that the Debtor was insolvent, had committed various acts of bankruptcy, and was unable to meet its debts as they matured.

4. The Debtor moved to dismiss the involuntary petition on the ground that Section 77 of the Act, 11 U.S.C.A. § 205, rather than Chapter X, governed the reorganization of the Debtor. Subsequently the Debtor filed in this Court a petition for reorganization pursuant to Section 77, alleging its inability to meet its debts. On November 24, 1954, the Court appointed William W. Golub as Receiver of the Debtor. On December 1, 1954, the Court denied the Debtor's motion to dismiss the Chapter X petition and the Debtor's application for approval of its Section 77 petition. D.C.1954, 126 F.Supp. 359.

5. Early in the "interim period" between August 11 and November 24, 1954, the Court by order authorized the Debtor to operate its business and to pay all proper expenses and obligations incurred by it in so doing. An appeal was taken from that order, but the appeal has never been prosecuted.

6. The Debtor thereafter filed an answer consenting to reorganization pursuant to Chapter X. On December 14, 1954, the Court approved the Chapter X petition, and appointed Herman T. Stichman as Trustee of the Debtor.

7. Subsequently, lengthy hearings were held upon the answer of an individ-

ual stockholder, denying that the Debtor was insolvent or unable to meet its debts as they matured. The Court found that, at the time of the filing of the involuntary petition, the Debtor was unable to meet its debts, and on January 9, 1956, again approved the Chapter X petition for reorganization, and reaffirmed its previous approval thereof. D.C.1956, 138 F.Supp. 195.

8. The Trustee's report pursuant to Section 167(5) of the Act, 11 U.S.C.A. § 567(5), summarizing his investigation of the property, liabilities, and financial condition of the Debtor, the operation of its business, and the desirability of the continuance thereof, was filed December 28, 1956. Thereafter notice was given to all creditors and stockholders, pursuant to Section 167(6) of the Act, that they might submit to the Trustee suggestions for the formulation of a reorganization plan or proposals in the form of plans. On August 30, 1957, the Trustee filed his Plan for the reorganization of the Debtor. Copies of the Plan were mailed to all creditors and stockholders, and notice of hearings on the Plan was mailed and published.

9. Hearings were held on the Trustee's Plan, and a comprehensive record made. On May 7, 1958, pursuant to Section 177 of the Act, 11 U.S.C.A. § 577, the Trustee's Plan was submitted to the Interstate Commerce Commission ("ICC"), the New Jersey Board of Public Utility Commissioners, and the New York Public Service Commission for suggested amendments of or objections to the Plan. After a hearing on the statements filed by such regulatory commissions the Court entered an order finding the Trustee's Plan worthy of consideration, and submitting it to the SEC for examination and an advisory report, pursuant to Section 172 of the Act, 11 U.S.C.A. § 572.

10. Thereafter, conferences were held among representatives of the three classes of bonds of the Debtor, looking toward agreement upon plan provisions. Substantial agreement was reached by the conferees and on October 31, 1958, the Trustee filed Amendment No. 1 to his Plan, revising it in essential conformity with the agreement of these bondholder representatives. Two additional amendments were proposed on behalf of certain bondholders. None of these amendments changed or proposed to change the basic structure of the Trustee's Plan.

11. By order dated November 3, 1958, the Court found the Trustee's Amended Plan and the proposed amendments thereof worthy of consideration, and submitted them to the SEC for examination and report in lieu of the Plan previously so submitted.

12. On December 3, 1958, the SEC filed its Report on the Trustee's Amended Plan and the proposed amendments. The Report of the SEC concluded that the Trustee's Amended Plan is feasible; that it is fair in excluding preferred and common stockholders from participation; that it provides a fair settlement of the claims of bondholders and other creditors; and that it should incorporate a revised provision for selection of the initial directors of the reorganized companies.

13. Further hearings were held upon the Trustee's Amended Plan. Objections were filed by representatives of certain stockholders and bondholders. Another plan proposal, incomplete on its face, was filed on behalf of certain bondholders and subsequently withdrawn from consideration. Oral argument was heard and briefs submitted. The Court has fully considered the record, briefs, and argument.

### The Debtor and its Business

14. The Debtor is a corporation organized in 1906, pursuant to the laws of the States of New York and New Jersey, by the merger and consolidation of three predecessor corporations. It is engaged in two types of business activities: the ownership and operation of the Hudson Tubes, an interurban electric railroad; and the ownership and operation of certain real estate in downtown Manhattan, New York City.

15. The Debtor's real estate is located in the two-block area bounded by Church, Cortlandt, Greenwich, and Fulton Streets and divided by Dey Street. The land area of approximately 107,400 square feet includes the entire block south of Dey Street and the entire Church Street frontage. The improvements consist of the Hudson Terminal buildings, two 22-story office buildings located at 30 and 50 Church Street, together with loft and store buildings fronting on Fulton, Dey, Cortlandt, and Greenwich Streets.

16. The Hudson Terminal buildings were constructed in 1907 and 1908. With their five-story annexes, erected in 1912, they cover an area of approximately 86,100 square feet and are of fireproof steel and reinforced concrete construction, with facades of brick and limestone. They are connected below grade at the concourse level, and by bridges across Dey Street at the third and seventeenth floors.

17. At grade level, the Hudson Terminal buildings are subdivided into stores on all street frontages and office space at the rear. The floors above grade are used for office space. There are three levels below grade, extending from Cortlandt to Fulton Streets and including the area under Dey Street, between the buildings. The concourse level, directly below grade, is served by ramps from Cortlandt and Fulton Streets and stairs from Dey Street. Stands and shops are located on the ramps and on the concourse. Some of the concourse space is used for railroad ticket offices, change booths, and baggage rooms.

18. Below the concourse level, connected with it by stairs, is the level at which the Hudson Terminal facilities of the railroad are located. Below the track level is a basement containing mechanical and power equipment and storage space, used in connection with the operations of the railroad and the office buildings.

19. The gross floor area of the Hudson Terminal buildings is approximately 1,427,000 square feet. The net rentable area as presently divided is approximately 973,000 square feet, including approximately 44,000 square feet of store space, 40,000 square feet at the concourse level, and 889,000 square feet of office space.

20. Prior to the commencement of the reorganization proceedings, the buildings were substantially as they had been when originally erected, except for renovation of ground floor lobbies in 1940 and 1941, and partial substitution of alternating current for direct current. During the reorganization proceedings it became apparent that substantial modernization was required in order to retain and attract major tenants. Pursuant to Court authorization, toilet facilities were modernized in 1956, additional alternating current risers were installed in 1958, and programs are currently under way for the rehabilitation of elevators and elevator lobbies, and for the installation of air conditioning in space leased at rentals which reflect charges therefor.

21. The railroad system of the Debtor provides passenger service only, under the Hudson River, between stations in downtown and midtown Manhattan and stations in Jersey City and Hoboken, New Jersey. In conjunction with the Pennsylvania Railroad, the Debtor operates a joint rapid-transit electric service between Hudson Terminal and Newark, New Jersey ("the joint service"). The Debtor owns approximately 7.9 miles of double-track main lines, all in subaqueous or subterranean tunnels, and leases approximately .6 mile of double track from the Pennsylvania Railroad in Jersey City, between the Journal Square station and the end of the Debtor's owned trackage east of that station.

22. The Debtor's downtown line includes two single-track tubes under the Hudson River between Hudson Terminal in Manhattan and Exchange Place in Jersey City. At Journal Square, this line connects with a line of the Pennsylvania Railroad running to Newark.

23. The Debtor's uptown line includes two single-track tubes under the Hudson River between its Christopher Street and Hoboken stations. In Manhattan, the uptown line extends easterly to Sixth Avenue and uptown to its terminal at 33rd Street and Sixth Avenue.

24. On the New Jersey side of the Hudson River, a line of the Debtor's railroad connects the downtown line in Jersey City, at a point west of Exchange Place, with the uptown line in Hoboken.

25. The Debtor operates local service trains between Hudson Terminal and Journal Square; between Hudson Terminal and Hoboken; between 33rd Street and Hoboken; and between 33rd Street and Journal Square. The joint service trains carry local service passengers of the Debtor between Hudson Terminal and Journal Square; passengers of the Pennsylvania Railroad between Journal Square and Newark; and "joint service passengers" between Newark and the Debtor's stations other than Journal Square. Joint service passengers between Newark and stations of the Debtor north of the downtown line transfer at Journal Square, Grove Street, or Exchange Place, in Jersey City.

26. The Debtor's operating arrangements with the Pennsylvania Railroad were embodied in two basic agreements made in 1903 and 1906, which were modified by numerous amendatory and supplemental agreements and by many letters between the Debtor and the Pennsylvania Railroad. Revisions of these agreements have been negotiated by the Trustee and included in two basic contracts, a joint service and operating agreement and an easement agreement. The new agreements were recently approved by order of the Court authorizing the Trustee to apply for such ICC approval as may be necessary.

27. The new agreements between the Debtor and the Pennsylvania Railroad represent both a consolidation and a revision of the agreements formerly in effect. They provide generally (as did the prior agreements) for a division of revenues and expenses of the joint service operations, 40% to the Debtor and 60% to the Pennsylvania Railroad. On the basis of 1958 operations, the revisions, which were made retroactive to July 1, 1957, result in increases in revenues and decreases in expenses of the Debtor aggregating a net annual benefit to the Debtor of approximately $87,000.

28. The major part of the Debtor's railroad revenues is derived from the interstate local service. In 1958, when gross passenger revenues aggregated $6,950,000, approximately $5,936,000 was supplied by the interstate local service, and $152,000 by the intrastate local services in New York and New Jersey. The Debtor's share of gross passenger revenues from the joint service amounted to approximately $862,000.

29. The Debtor has approximately 200 motorized passenger cars, the so-called "black cars," for its local services. A majority of these cars were acquired during the years 1908 through 1911, and the balance during the years 1921 through 1928. Thirteen of the black cars were given a major overhauling during the period 1952 through 1956. The others have never been so overhauled.

30. During the reorganization proceedings it appeared that the passenger cars used in the joint service, some owned by the Pennsylvania Railroad and some by the Debtor, presented a serious hazard to safety of operation. Pursuant to authorization of the Court, the Trustee purchased 20 new cars at an aggregate price of approximately $1,700,000 for the joint service. Harding v. Stichman, 2 Cir., 1957, 240 F.2d 289. At the same time, the Pennsylvania Railroad purchased 30 such cars. The new joint service cars have been delivered and are now in service.

31. The Debtor has three minor subsidiary companies, wholly-owned which perform services incidental to its operations, substantially at cost. Such services include the sale of advertising in railroad cars and at railroad stations, cleaning, painting and porter service in the office buildings, and certain porter services at terminal stations.

**Causes of Bankruptcy**

32. The financial difficulties of the Debtor stem from an initial overcapitalization with debt securities, combined with a progressively increasing squeeze on the railroad operations from rising operating expenses and loss of passengers to publicly-financed vehicular cross-

ings of the Hudson River by bridge and tunnel.

33. Attempts by predecessor companies to construct the Debtor's tunnels date from 1873. Owing to financial and construction difficulties the tunnels had not been completed in 1906, when three constituent companies with outstanding funded debt aggregating $56,500,000 were consolidated to form the Debtor. In 1908 the Hudson Terminal buildings were opened for occupancy, and railroad service began on the uptown line. By the end of 1911 the Debtor had outstanding $67,148,000 of First Mortgage bonds, and was also obligated on $5,000,000 of bonds of a predecessor company, assumed in 1906.

34. The Hudson Terminal buildings were almost fully rented and the railroad lines carried 58,000,000 passengers in 1912. However, this was not enough to cover the fixed interest on more than $72,000,000 of indebtedness and the combined operation showed a net loss of almost $76,000 for the year, without accrual of depreciation for the last nine months.

35. In 1913 a plan for the readjustment of its debt was proposed by the Debtor and carried into effect. The 1913 Readjustment Plan provided for the issuance, in exchange for each $1,000 First Mortgage bond, of a $500 First Lien and Refunding Mortgage bond bearing fixed interest at the rate of 5% per annum and a $500 Adjustment Income Mortgage bond bearing interest at the same rate, contingent on earnings. The contingent interest was non-cumulative prior to January 1, 1920, and cumulative thereafter, payable out of subsequent earnings or upon maturity of the bonds. The maturity date of the new bond issues was the same as that of the First Mortgage bond issue, February 1, 1957.

36. Pursuant to the 1913 Readjustment Plan, $66,204,000 principal amount of First Mortgage bonds were exchanged and were deposited by the Debtor with the Refunding Mortgage indenture trustee as collateral security for both the Refunding Mortgage bonds and the Adjustment Income Mortgage bonds. This left outstanding $944,000 principal amount of First Mortgage bonds, of which $2,000 principal amount were subsequently acquired by the Debtor and cancelled.

37. Pursuant to the 1913 Readjustment Plan an additional $3,460,633 principal amount of Refunding Mortgage bonds were sold to stockholders for $3,845,000, to supply working capital and to meet the expenses of carrying out the plan. Further sales of $972,000 principal amount of Refunding Mortgage bonds for construction purposes between 1913 and 1917 brought the total issue of Refunding Mortgage bonds up to $37,534,633.

38. In 1932 the $5,000,000 bond issue assumed by the Debtor matured and was paid in cash. Despite a continuing decline in passenger traffic and operating income after 1927, the Debtor inaugurated a practice in 1934 of purchasing in the open market, at substantial discounts below par, large amounts of its outstanding Refunding Mortgage bonds and Adjustment Income Mortgage bonds. Funds for such purchases were obtained principally from a Property Amortization Fund, set up in 1913 to fund the depreciation reserve and provide resources for the replacement of outworn equipment. Bond purchases continued until 1949. By the end of 1951 all of the assets remaining in the Property Amortization Fund, other than $4,758,000 principal amount of the Debtor's Refunding Mortgage bonds, had been dissipated.

### Liabilities and Capitalization

39. As of August 11, 1954, the Debtor had outstanding the following mortgage bonds:

First Mortgage 4½% bonds ...... $   942,000  
Refunding Mortgage 5% bonds ... 28,583,405  
Adjustment Income  
  Mortgage 5% bonds .......... 16,814,000  
                       $46,339,405

40. The stated maturity date of all of the bonds was February 1, 1957. In addition, at August 11, 1954, accrued and unpaid interest on the Adjustment Income Mortgage bonds, which would also become due and payable on February 1, 1957, amounted to $10,981,646.

41. During the reorganization proceedings the Trustee, with Court approval, made two cash distributions aggregating $125 per $1,000 principal amount to the holders of the publicly-held First Mortgage bonds and the Refunding Mortgage bonds of the Debtor. A 6% distribution was made in November 1956, and a 6½% distribution in September 1958, aggregating $3,690,475.

The orders of the Court authorizing such distributions provided that the payments would be made on account of principal, but reserved jurisdiction, among other things, to compute the claims of bondholders as if the payments had been made on account of interest, in the event the mortgaged assets were ultimately found to equal or exceed the amount of the reduced principal and unpaid interest on the publicly-held First Mortgage bonds and Refunding Mortgage bonds.

42. At December 31, 1958, the Debtor's liabilities per books, including outstanding bonds but excluding uncollected distributions thereon covered by special bank deposits, were as follows:

*First Mortgage bonds*

| | | |
|---|---|---|
| Principal amount | $ 824,250 | |
| Accrued interest | 180,793 | |
| | $ 1,005,043 | |
| Unclaimed interest | 4,073 | $ 1,009,116 |

*Refunding Mortgage bonds*

| | | |
|---|---|---|
| Principal amount | $25,010,680 | |
| Accrued interest | 6,095,400 | |
| | $31,106,080 | |
| Unclaimed interest | 98,642 | 31,204,722 |

*Adjustment Income Mortgage bonds*

| | | |
|---|---|---|
| Principal amount | $16,814,000 | |
| Accrued interest | 14,669,879 | |
| | $31,483,879 | |
| Unclaimed interest | 34,066 | 31,517,945 |
| Total bonded debt | | $63,731,783 |
| Other liabilities | | 995,785 |
| Total Liabilities | | $64,727,568 |

43. The Trustee's books, and the liabilities shown above, do not reflect such costs and expenses of administration as are to be fixed hereafter by the Court.

44. The Debtor also has outstanding 52,500 shares of 5% non-cumulative preferred stock, par value $100 per share, and 399,999.5 shares of common stock, par value $100 per share.

45. Interest continues to accrue upon the bonds in the amount of approximately $2,128,000 per annum at coupon rates. The claims of the senior bondholders at December 31, 1958, would be increased by approximately $225,000, and annual interest accruals by approximately $185,000, if it were assumed that the cash distributions to bondholders dur-

ing the reorganization proceedings should be treated as payments on account of interest rather than principal. Computation of interest at 6% after declarations of default by indenture trustees would further increase the claims at December 31, 1958, of Refunding Mortgage bondholders (by approximately $1,100.00) and Adjustment Income Mortgage bondholders (by approximately $500,000), and would increase annual interest accruals by approximately $450,000.

## The Trustee's Amended Plan

46. The Trustee's Amended Plan is based upon the premises that the Debtor is insolvent in that the value of its assets is less than the allowable claims of creditors; that apart from the possibility of a sale of the railroad property to a public authority, the value of the Debtor's assets is less than the aggregate amount of its publicly-held First Mortgage bonds and its Refunding Mortgage bonds; and that the assets of the Debtor at August 11, 1954, included current assets not subject to the liens of the Debtor's mortgage indentures, in which holders of unsecured claims, including claims for deficiencies of mortgaged assets to satisfy claims of bondholders, are entitled to participate.

47. The Trustee's Amended Plan treats the publicly-held First Mortgage bonds on a parity with the outstanding Refunding Mortgage bonds, senior to the Adjustment Income Mortgage bonds. It is designed to recognize the prior right of the senior bondholders to participate in the value of the mortgaged assets unless their claims are satisfied in full, while recognizing the claims of the Adjustment Income Mortgage bondholders and other creditors against free assets are not subject to the mortgage liens, and to provide a contingent interest for Adjustment Income Mortgage bondholders in the proceeds of a sale of the railroad, if such a sale realizes more than is required to meet the claims of the senior bondholders.

48. The Debtor will continue its corporate existence as a Real Estate Company. A new Railroad Company will be organized as a subsidiary of the Real Estate Company.

49. The Railroad Company will acquire from the Debtor its railroad property, other than the portion thereof which constitutes any part of the Hudson Terminal buildings or the land upon which they are situated; the materials and supplies and other assets incident to the operation of the railroad; the stock of Hudson Tubes Advertising Corp. and H & M Parcel Room, Inc.; and enough cash, deposits and Government securities (estimated in the record at $500,000) to cover its liabilities, to provide working capital, and to meet all anticipated cash requirements for a period of two years. Its capitalization will consist of 1,000 shares of common stock, all to be held by the Real Estate Company. The Railroad Company will pay to the Real Estate Company, for occupancy of concourse and track level space, an amount equal to 50% of the taxes on the land occupied by the Hudson Terminal buildings and 14% of the taxes on the improvements, and for such office space in the Hudson Terminal buildings as it may occupy, at an amount equal to the fair rental value thereof.

50. The Real Estate Company will retain all of the other assets of the Debtor. It will issue $10,038,100 principal amount of twenty-year 6% first mortgage bonds ("New Bonds") to the senior bondholders of the Debtor and will be empowered, for two years following the date of consummation, to issue up to $2,500,000 principal amount of new Prior Lien Obligations. It will have an authorized capital of 590,476 shares of a new Class A common stock and 58,849 shares of a new Class B common stock.

51. Public holders of the First Mortgage bonds will receive $320,280 principal amount of the New Bonds and 18,840 shares of Class A stock, on the basis of $340 principal amount of New Bonds and 20 shares of Class A stock for each $1,000 original principal amount of the First Mortgage bonds.

52. Holders of the Refunding Mortgage bonds will receive $9,717,820 principal amount of New Bonds and 571,636 shares of the Class A stock, also on the basis of $340 principal amount of New Bonds and 20 shares of new Class A stock for each $1,000 original principal amount.

53. The distributions to senior bondholders of the New Bonds and Class A stock of the Real Estate Company will be in satisfaction of their claims to principal and accrued interest, and will be in addition to the $125 cash heretofore distributed per $1,000 original principal amount of the senior bonds. Unclaimed interest, and scrip for fractional parts of Refunding Mortgage bonds, will be paid in cash, at face amount.

54. Holders of the Adjustment Income Mortgage bonds will receive all of the Class B stock, on the basis of 3½ shares for each $1,000 principal amount, in satisfaction of their entire claim for principal and accrued interest. Unclaimed interest will be paid in cash, at 20% of the amounts allowed.

55. Administration expenses, including such allowances as may be made by the Court, will be paid by the Trustee or assumed and paid by the Real Estate Company.

56. Obligations incurred by the Receiver or Trustee will be assumed and paid by the Real Estate Company, with the exception of liabilities for franchise rentals and tort claims arising from railroad operations after November 23, 1954, which will be assumed and paid by the Railroad Company.

57. "Interim claims," consisting of unpaid claims for materials and services which arose during the pre-receivership period in 1954 from August 12 to November 23, inclusive, and "six-months claims," consisting of such unpaid expenses of ordinary operations incurred by the Debtor after May 23, 1954, as may be found by the Court to be entitled to priority, will be paid in cash. Federal, State and local tax claims, in such amounts as shall be agreed to by the claimant and the Trustee and approved by the Court, will be paid in cash. Based

upon the Trustee's estimates, it appears that these cash payments will not exceed $250,000.

58. General unsecured claims against the Debtor (estimated by the Trustee at approximately $350,000 as at December 31, 1958) will be paid in cash at the rate of 10% of such amounts as may be finally allowed.

59. No participation is provided for the preferred stock or common stock of the Debtor.

60. The Prior Lien Obligations (to be issued only if required to modernize the Hudson Terminal buildings) will have a first lien on the Hudson Terminal buildings and land, subject to the lien of the costs and expenses of administration to be fixed by the Court.

61. The New Bonds will be secured by a lien on the Hudson Terminal buildings and land and on all other real and personal property owned by the Real Estate Company at the date of consummation, or thereafter acquired, except for the stock of the Railroad Company and any distributions thereon. The lien of the New Bonds will be subordinate only to the liens of the Prior Lien Obligations, if issued, and of the costs and expenses of administration.

62. The New Bonds will be dated as of a date within one month of the date of consummation, will mature twenty years thereafter, and will bear interest at 6% per annum, payable semi-annually. During each of the third through the nineteenth years of the term, the Real Estate Company will spend not less than (a) $900,000 plus (b) 25% of the amount, if any, by which the gross income of the Real Estate Company for the calendar year ended during such year of the term of the New Bonds exceeds $1,200,000 for combined interest on and redemption of (1) such Prior Lien Obligations or bank loans as shall have been incurred for modernization of the Hudson Terminal buildings, and (2) the New Bonds.

63. The Class A stock and the Class B stock of the Real Estate Company will represent the same equity per share in

the assets and earnings of the Real Estate Company and in the proceeds of any sale of the stock or property of the Railroad Company up to $17,000,000. Approximately 91% of the shares of common stock outstanding will be Class A stock, and 9% Class B stock.

64. The first portion of the net proceeds of any sale or liquidation of the Railroad Company, up to $17,000,000, will be distributed pro rata among stockholders of the Real Estate Company, Class A and Class B alike, except that up to $7,000,000 thereof may be retained and used for debt retirement or other valid corporate purposes. Not more than $4,000,000 of the $7,000,000 may be used for purposes other than debt retirement, and such other use will require approval of a majority of the outstanding stock, Class A and Class B alike.

65. Any net proceeds of sale or liquidation of the Railroad Company in excess of $17,000,000 will be distributed among the holders of Class A and Class B stock as follows: (a) If the sale shall have occurred on or before June 30, 1963, 90% of any such excess will be distributed pro rata among the holders of the Class B stock only, and 10% thereof pro rata among the holders of the Class A stock only. (b) If the sale shall have occurred after June 30, 1963, and on or before February 28, 1970, the percentage going to the Class B stockholders will be reduced from 90%, and the percentage going to the Class A stockholders increased from 10%, by 1% for each month after June 1963, to and including the month of sale. (c) All such proceeds of any sale occurring on or after March 1, 1970, will be distributed pro rata among holders of the common stock of the Real Estate Company, Class A and Class B alike.

66. The initial boards of directors of both companies will be appointed by the Court after consideration of nominations of bondholders or their representatives. The Court will designate seven of the nine directors of the Real Estate Company and five of the seven directors of the Railroad Company to represent the

Class A stock, and two directors of each company to represent the Class B stock. Successor directors will be elected by class voting prior to June 30, 1965, and by voting without regard to class thereafter.

67. Any sale of the property or stock of the Railroad Company on or before June 30, 1965, will require approval by a majority of the representatives of the Class A stock and both representatives of the Class B stock on the board of the selling company, except that if approved by either group it may be consummated upon approval of the Court, after notice to stockholders and hearing. Each election of the president of the Railroad Company on or before that date, unless a sale shall have occurred, will require the votes of a majority of the representatives of the Class A stock and of both representatives of the Class B stock on the Railroad Company board. Failing such votes, the president of the Railroad Company will be appointed by the Court. The Court will reserve appropriate jurisdiction until June 30, 1965.

## Proposed Modifications

68. Representatives of certain Adjustment Income Mortgage bondholders have proposed an amendment to change the date governing the relative participations of Class A and Class B stock in any proceeds of sale or liquidation of the Railroad Company exceeding $17,000,000 from the month in which the sale shall have occurred to the month in which the contract of sale shall have been executed.

69. Representatives of certain Refunding Mortgage bondholders have proposed an amendment requiring the Court to designate the initial boards of directors from among the nominees of bondholders, giving appropriate consideration and weight to the amounts of the bonds held by the nominators.

## Earnings and Valuation

70. The following table (000's omitted) sets forth a summary of the Debtor's income for the eight years 1951 through 1958:

| | 1951 | 1952 | 1953 | 1954 | 1955 | 1956 | 1957[a] | 1958 |
|---|---|---|---|---|---|---|---|---|
| *Railroad* | | | | | | | | |
| Operating revenues | $7,233 | $7,774 | $7,328 | $7,171 | $7,210 | $7,174 | $6,226 | $7,393 |
| Operating expenses before depreciation | 7,018 | 6,964 | 6,988 | 6,926 | 6,668 | 7,032 | 6,798 | 7,152 |
| Operating income before depreciation | 215 | 810 | 340 | 245 | 542 | 142 | (572) | 241 |
| Depreciation and retirements | 535 | 542 | 558 | 561 | 563 | 550 | 535 | 573 |
| Operating income or (loss) | (320) | 268 | (218) | (316) | (21) | (408) | (1,107) | (332) |
| *Real Estate* | | | | | | | | |
| Operating revenues | 2,897 | 3,101 | 3,255 | 3,287 | 3,341 | 3,404 | 3,468 | 3,574 |
| Operating expenses before depreciation | 1,795 | 1,834 | 1,906 | 1,956 | 1,866 | 1,869 | 2,046 | 2,025 |
| Operating income before depreciation | 1,102 | 1,267 | 1,349 | 1,331 | 1,475 | 1,535 | 1,422 | 1,549 |
| Depreciation | 201 | 201 | 211 | 211 | 211 | 213 | 213 | 215 |
| Operating income | 901 | 1,066 | 1,138 | 1,120 | 1,264 | 1,322 | 1,209 | 1,334 |
| Total operating income | 581 | 1,334 | 920 | 804 | 1,243 | 914 | 102 | 1,002 |
| Other income or (loss)—net[b] | 8 | (14) | (16) | (24) | (67) | 34 | 118 | 106 |
| Net income before bond interest | 589 | 1,320 | 904 | 780 | 1,176 | 948 | 220 | 1,108 |
| Bond interest | 2,312 | 2,312 | 2,312 | 2,312 | 2,312 | 2,298 | 2,223 | 2,192 |
| Net (loss) | $(1,723) | $(992) | $(1,408) | $(1,532) | $(1,136) | $(1,350) | $(2,003) | $(1,084) |

[a] Operations ceased from March 28, 1957, to April 29, 1957, as a result of a strike of non-operating unions.

[b] After deducting "Income Deductions" other than interest on funded debt.

71. The average net income before bond interest for the eight-year period was approximately $881,000, less than 40% of the interest requirements on the bonds outstanding.

72. Railroad operations for the eight-year period were conducted at a substantial loss, averaging approximately $307,000 per annum. The average annual operating income from real estate operations was approximately $1,169,000. Railroad depreciation and retirements amounted to approximately $552,000 per annum, so that there was an average cash throw-off from railroad operations (before capital expenditures) in the amount of approximately $245,000 per annum.

73. In order to arrive at an appropriate going-concern valuation of the Debtor's estate, evidence was introduced as to the prospective earnings from real estate operations and from railroad operations, before overhead costs of management, and of the earnings of the combined enterprise including such management costs.

74. The firm of James Felt & Company, Inc. was retained to appraise and analyze the real estate. Testimony in support of the appraisal and analysis was presented by Paul T. O'Keefe, then the Senior Vice-President of James Felt & Company, Inc.

75. O'Keefe valued the property in its then condition, in the latter part of 1957, but on the assumption that the Hudson Terminal buildings would promptly be modernized and rehabilitated. It was his opinion, as stated in the appraisal report, that the earning potential of the property was sufficient to justify a substantial program of modernization and rehabilitation, and that such a program was essential to prevent a substantial decline in investment value.

76. O'Keefe made a thorough study of the Hudson Terminal buildings and adjacent properties of the Debtor, their location and physical characteristics, their tenancies, and their earnings and history. His estimate of net real estate operating income, before depreciation, Federal income taxes, corporate expenses, and capital charges, was $1,633,000 per annum.

77. O'Keefe's figures include the rental value of office space occupied by the Debtor. The rental value of space occupied by the railroad at track and concourse levels is reflected by charging part of the real estate taxes to the railroad, in an amount consistent with current accounting allocations by the Trustee. O'Keefe found such allocation of taxes approximately equal to the rental value of space occupied by the railroad at track and concourse levels.

78. O'Keefe's figures also assume continuation of conjunctional billing by Consolidated Edison Company of New York, Inc. for electricity supplied to the Debtor. The Trustee is contesting a proposed change in billing, which would add approximately $40,000 per annum to real estate operating expenses.

79. The rehabilitation program urgently recommended by O'Keefe in order to maintain and improve the value of the property included the installation of new high-speed automatic elevators, and of enough additional alternating current risers to replace the direct current then provided for most of the tenants. He also recommended the modernization of elevator lobbies. It was his judgment that the cost of such a program would approximate $3,600,000; and that it would result in higher values, through additional rentals, sufficient to justify the program. He recommended also that air conditioning be installed when and as arrangements could be made to pay for the cost out of increased rentals.

80. O'Keefe submitted an estimate of net operating income of the Hudson Terminal buildings before depreciation, Federal income taxes, corporate expenses, and capital charges, predicated upon completion of the $3,600,000 rehabilitation program. On that basis, his estimate of net real estate operating income comes

to $2,274,000 per annum. This estimate reflects increased rentals, decreased cost of elevator operation, and increased real estate taxes which in his judgment would result from the rehabilitation program.

81. O'Keefe estimated the value of the Debtor's real estate, before rehabilitation of the Hudson Terminal buildings but reflecting the prospect that they would be modernized, as follows:

|  | Hudson Terminal Buildings | Other Real Estate | Total |
|---|---|---|---|
| Land | $ 5,200,000 | $800,000 | $ 6,000,000 |
| Buildings | 10,800,000 | 150,000 | 10,950,000 |
|  | $16,000,000 | $950,000 | $16,950,000 |

82. Based upon O'Keefe's estimates of real estate earnings, Isidor Spinrad, Chief Fiscal Officer of the Trustee, prepared and testified to estimates of the results of operation of the Real Estate Company both before rehabilitation, and after consummation of the rehabilitation program (exclusive of air conditioning) recommended by O'Keefe.

83. Before rehabilitation, Spinrad's estimate of gross income of the Real Estate Company amounts to approximately $1,275,000 per annum, after $219,000 of depreciation, or approximately $1,494,000 per annum before depreciation.

84. After consummation of the rehabilitation program, at an assumed capital cost of $3,600,000, Spinrad's estimate of gross income of the Real Estate Company comes to approximately $1,825,000 per annum, after depreciation of $279,000, or approximately $2,104,000 per annum before depreciation.

85. The estimates submitted by O'Keefe and Spinrad were subjected to cross-examination by the parties and were reviewed by the SEC in its Report. The SEC rounded off O'Keefe's valuation of the real estate properties at $17,000,000, and concluded that that figure may reasonably be accepted as the value of the Real Estate Company (apart from its interest in the Railroad Company) for purposes of testing the feasibility and fairness of the Trustee's Amended Plan.

86. The estimates were carefully and conscientiously prepared by experts thoroughly qualified on the basis of experience and competence. The Court has considered them in the light of developments in the record of the proceedings subsequent to the preparation of the exhibits and the submission of testimony late in 1957 and in the spring of 1958.

87. During that period, there has been a substantial increase in vacant space in the Hudson Terminal buildings, caused by the competition of newly-erected modern structures. Most of the tenants occupying whole-floor space in 1957 have either moved out of the buildings, or have indicated an intention to do so upon the expiration of their leases. On the other hand, the Trustee has recently rented three whole floors in 30 Church Street, and one in 50 Church Street, to substantial tenants, and has embarked upon a program of rehabilitation and management designed to retain and improve the earning power of the buildings.

88. The new alternating current risers have been installed. A bid for new automatic elevators has been accepted. The Trustee has been authorized to solicit bids on the related structural work and the renovation of lobbies. The Trustee's program for air conditioning the whole floors recently rented has been commenced, and will provide facilities for additional air conditioning in 30 Church Street as justified by other leases. However, before the rehabilitation program can be fully reflected in increased rentals and the renting of vacated space, real estate operating income may for some

time be less than the estimates appearing in the record.

89. The estimates of real estate value in the record assume the normal incidence of Federal corporate income taxes. Spinrad testified to actual and estimated Federal income tax net operating losses for the five years ended December 31, 1958, aggregating approximately $6,424,-000. Pursuant to the provisions of the Internal Revenue Code, permitting the carry-over of such losses as deductions against future taxable income, it appears that the Real Estate Company would not be required to pay Federal income taxes for a period of approximately five years after consummation of the Trustee's Amended Plan. Although this factor does not affect the amount of earnings before taxes, it has a significant effect upon the value of such earnings to security holders of the Real Estate Company, and thus upon the valuation of the enterprise.

90. Giving due consideration to the entire record bearing upon value, the Court finds that $17,000,000 is the reasonable value of the Real Estate Company, apart from its interest in the Railroad Company and apart from the value of any tax loss carry-over.

91. The railroad operations of the Debtor have been conducted for many years at an operating loss. The Debtor's railroad carries no freight. The bridge, tunnel, and bus terminal facilities of the Port of New York Authority, constructed from 1927 on, have drained heavily from the passenger traffic which otherwise would be carried by the Debtor's railroad.

92. Approximately 113,100,000 passengers used the Debtor's railroad in 1927, and approximately 65,800,000 in 1941. In 1958 slightly less than 30,500,-000 passengers used the railroad. Large fare increases have been made, so that gross passenger revenues in 1958 were only about 17½% below the revenues in 1927, and 28% higher than in 1941. However, railroad operating expenses other than depreciation increased 68% between 1941 and 1958.

93. As shown in the tabulation of income above, during each of the past eight years, except for the year 1952, operating expenses including depreciation have exceeded operating revenues, resulting in an average operating loss of approximately $307,000 per annum. In each of those years except the year 1957, affected by a one-month strike, operating expenses before depreciation exceeded operating revenues, resulting in an average cash throw-off of approximately $245,000 per annum before capital expenditures.

94. Spinrad estimated operating results in 1958 and 1959. His estimates were based upon the fares in effect at the time they were made, in the fall of 1957, and upon operating expenses at levels then current, adjusted for wage increases required by or likely to result from contracts then in effect. He also took into account the estimated benefits of the proposed revision of agreements with the Pennsylvania Railroad.

95. Spinrad's estimates of operating losses for the years 1958 and 1959 were $435,000 and $633,000 respectively. He estimated a cash throw-off, before depreciation and amortization, of $140,000 for the year 1958, and a cash loss, before depreciation and amortization, of $28,000 for the year 1959. He stated that under existing conditions his estimates for 1959, without substantial changes, would apply to subsequent years as well.

96. Spinrad did not estimate the effect of possible ferry closings upon the income and expenses of the Debtor's railroad. At the time he testified, four railroad ferries carried passengers across the Hudson River between New Jersey and Manhattan. The latest figures then available showed that the Central Railroad of New Jersey ferries carried approximately 7,400,000 passengers per annum; the Erie Railroad ferries approximately 600,000; the Delaware, Lackawanna & Western Railroad ferries approximately 9,500,000; and the ferries of the West Shore Division of the New York Central Railroad approximately 1,-000,000.

97. The record indicates that the closing of all of the ferries across the Hudson River would have some beneficial effect upon the Debtor's railroad operations. The Trustee, in his testimony, discussed the possibility that all of the ferries might be closed down, and stated: "I am not sure that it could be a profitable operation even if the ferries closed, but it might not necessarily be a losing operation." (Tr. 6805)

98. The Lackawanna ferries operate from Hoboken where the Erie and Lackawanna now have a common terminal adjacent to the Debtor's Hoboken station. There is no application now pending before any regulatory agency for the discontinuance of this ferry service. It is entirely speculative as to whether and when this ferry service will be discontinued and, if such discontinuance should occur, whether it would be accompanied by a discontinuance of some or all of the suburban train service feeding the Hoboken terminal.

99. The Erie ferries operated until recently from the Erie terminal adjacent to the Debtor's Erie station. The Erie ferry service was discontinued toward the end of 1958. At that time, however, the remaining Erie trains using that terminal had been shifted to Hoboken, where the Lackawanna ferries still operate, and only a few trains of the New York, Susquehanna & Western Railroad continued to use the Erie Terminal. The closing of these ferries was thus of negligible benefit to the Debtor.

100. The terminal of the West Shore Railroad is situated several miles north of the Debtor's Hoboken station. The West Shore ferries were discontinued in March 1959 and most of the traffic formerly carried by that road has now been lost.

101. The terminal of the Jersey Central is situated several miles south of the Debtor's line between Exchange Place and Journal Square. The testimony of the Trustee indicates that, in order for the Debtor's railroad to obtain as passengers the bulk of the persons now using the Jersey Central ferries, a physical connection would be required to the Jersey Central lines, which would require public assistance. It is entirely speculative as to whether and when the Jersey Central ferry service will be discontinued and, if such discontinuance should occur, whether the necessary connection with the Debtor's lines would be constructed at public expense, where such connection would be made, or whether the discontinuance of ferries would be accompanied by reductions in Jersey Central train service.

102. Counsel for preferred and common stockholders have urged that the record does not permit a finding as to the going-concern value of the railroad, because there are no detailed estimates in the record as to the precise impact upon revenues and expenses in the event of ferry closings and the construction of necessary connections. Such counsel had full opportunity to offer such evidence, but did not do so. Even if they had proffered such evidence, the assumptions which would have to be indulged are subject to so many contingencies and uncertainties, including action by various political bodies and regulatory agencies, as to render such estimates of little or no probative force.

103. Counsel for the stockholders have referred among other things to a statement of the Trustee that the closing of all the ferries and the transfer of 90% of their passengers to the Debtor's lines would mean a potential increase in gross passenger revenues of approximately $4,000,000 annually. Concurrent increases in operating expenses and capital expenditures would have to be considered in relation to any such possible increase in traffic, as indicated by the Trustee's testimony referred to above. Any increase in net operating income would be offset, at least in part, by prospective net operating losses apart from such a change. Any resultant theoretical valuation would have to be given little or no weight in estimating present and reasonably foreseeable values, in view of the enormous uncertainties as to what will eventuate, as well as the period

**166**

,of time that would be required to bring these hypotheses to fruition.

104. Counsel for the stockholders also have contended that the reasonably prospective earnings of the Debtor's railroad should take into account the possibility of the Debtor's obtaining an exemption from the taxation of its railroad properties by the States of New York and New Jersey. These taxes now amount to $337,000 annually. Here, again, the argument is based upon pure speculation. While a two-year tax exemption statute was passed by New York early in 1958, New Jersey failed to enact the necessary concurrent legislation in 1958 or thus far in 1959. It is wholly unpredictable whether New Jersey will ever take the necessary legislative action, and it is equally uncertain whether the two States would then extend the tax relief beyond the two-year period now provided in the New York statute.

105. In the reasonably foreseeable future, the Debtor's railroad will operate at a loss. There accordingly is no basis for the valuation of the railroad by a capitalization of reasonably foreseeable earnings.

106. The SEC Report recommends that the value of the assets to be acquired by the Railroad Company for the purposes of testing the feasibility and fairness of the Trustee's Amended Plan is not in excess of $3,500,000. That figure is based primarily upon evidence of liquidation value ($1,278,200) prior to the Trustee's investment in the new joint service cars; the estimated investment in new cars ($1,700,000) less probable loss in the event of liquidation ($500,000); the potential rental value of the tunnels, on the uncertain assumption that their use would survive a termination of railroad operations ($525,000); and the amount of cash to be provided, pursuant to the Trustee's Amended Plan, for working capital needs ($500,000).

107. The Trustee testified with respect to the possibility that substantially more might be realized for the railroad properties in the event of a sale to a public agency. Throughout these proceedings, the Trustee has devoted a great deal of time and effort to the promotion of legislative and executive action, in the States of New York and New Jersey, that would permit a purchase of the railroad by a public body and provide tax relief prior to such a purchase.

108. The Trustee testified, with the qualification that his testimony was "a little optimistic," that the maximum price which would be likely to be realized in the event that the Debtor's properties were acquired by a public agency is "not to exceed $40 million, somewhere between $35 and $40 million." (Tr. 6809–10). The Trustee's judgment on this subject was based upon his entire knowledge of the situation, including whatever potential might exist in ferry closings.

109. The Court finds that the value of the assets to be acquired by the Railroad Company under present and reasonably foreseeable circumstances, apart from the potential values that might be realized upon a sale of the railroad to a public agency, is not in excess of $3,500,000, and that the amount that could be realized in the event of such a sale is not more than $40,000,000.

110. The Court finds that the present value of all the Debtor's assets, apart from the prospects of sale of all the assets or the railroad to a public agency, is substantially less than the claims of senior bondholders of the Debtor; and that the maximum potential value of the enterprise in the event of such a sale is substantially less than the aggregate claims of all creditors.

111. The Debtor is insolvent.

**Fairness and Equity**

112. The Court has considered the fairness of the Trustee's Amended Plan first as between creditors and stockholders of the Debtor; and secondly as among the several classes of creditors.

113. The claims of creditors aggregated between approximately $64,700,000 and approximately $66,500,000 at December 31, 1958, and continue to

increase. Under standards of fairness and equity established by the United States Supreme Court, creditors must receive full compensation for their claims before holders of equity securities may be permitted to participate under a plan. The properties and assets of the Debtor are insufficient to provide such full compensation for its creditors.

114. Counsel for certain stockholders have recommended that the Trustee's Amended Plan be amended to provide for the issuance to stockholders of shares of a "Class C" stock which would acquire some value only if values in excess of the claims of creditors should somehow develop at some future date. This, they urged, would cure what they contend is the unfairness of the Amended Plan in its exclusion of the stockholders from participation in the reorganized enterprise. It may be noted that, even if such a Class C stock could legally be issued, it would be valueless under the stockholders' proposal unless the railroad were sold for more than $45,000,000, more than the maximum sale price for the railroad as testified to by the Trustee and found herein.

115. The SEC Report advises that such an amendment would create a highly deceptive and speculative security which would be injurious to the public interest and the interest of investors, and would render the Trustee's Amended Plan unfeasible. The Court is in accord with those views.

116. The Court finds that the stockholders of the Debtor have no interest in its assets. The Trustee's Amended Plan is fair and equitable in excluding them from participation.

117. The Trustee's Amended Plan provides that all of the securities to be issued thereunder be distributed among bondholders, and that other creditors of the Debtor be compensated in cash.

118. The provisions for payment to various priority creditors of cash in the amount of their claims as finally allowed, without interest, are fair and equitable to them and to the bondholders. The cash and current investments of the Debtor appear ample to provide for such payments. In view of the order of the Court authorizing the Debtor to operate its business during the period prior to the appointment of a Receiver, and upon the further ground (relied upon in the SEC Report) that the outstanding interim claims are insubstantial in amount, the interim claims are properly included among those entitled to priority.

119. The provisions for payment of cash to bondholders on account of interest deposited for payment but unclaimed at August 11, 1954, and on account of scrip for fractional parts of bonds, are fair and equitable. Such claims of senior bondholders will be paid at 100% of the amount allowed, and of junior bondholders at 20% of the amount allowed, both without interest. Such cash payments, rather than the issuance of securities, are appropriate in view of the respective priorities of claim and the small amount of each individual claim.

120. The provision for payment of general unsecured claims on the basis of 10¢ in cash for each $1 face amount of claim finally allowed is fair and equitable. The amount of secured claims against the Debtor is substantially in excess of the value of its assets. It appears from the record that certain of the assets when the petition for reorganization was filed, particularly cash and certain other current assets, were not subject to the liens of the Debtor's outstanding mortgages. There are serious issues as to the amount of such "free assets" and as to whether expenses of these reorganization proceedings are chargeable against some or all of those assets. In addition, in view of the large deficiency claims of bondholders entitled to share pro rata in the distribution of free assets, it is questionable whether the amount of free assets available for the satisfaction of all claims against them would support an allowance of as much as 10% of the face amount of those

168

claims. In the light of all the circumstances, including the comparatively small amount of the aggregate payments to general unsecured creditors under the Trustee's Amended Plan, no problem of unfairness to bondholders is presented.

121. There remains for consideration the proposed treatment of the three classes of the Debtor's outstanding bonds, each secured by a lien on all of the property of the Debtor other than free assets.

■ 122. It is clear from the record, and the fact is not disputed, that the lien of the Refunding Mortgage bonds is senior to that of the Adjustment Income Mortgage bonds. A more difficult question is involved in the priority status of the publicly-held First Mortgage bonds as against the other two bond issues. A compromise of that issue is proposed in the Trustee's Amended Plan, with the support of all of the substantial bondholders represented in the proceeding.

123. If full effect were given to the pledge of First Mortgage bonds, pursuant to the 1913 Readjustment Plan, as security for the other bond issues, the publicly-held First Mortgage bonds, representing approximately 1.4% of the entire issue, would be entitled to approximately that percentage of the Debtor's assets, or a relatively small percentage of their claims.

124. Throughout the proceedings the representatives of First Mortgage bondholders have contended that the attempted pledge was invalid, and that the publicly-held First Mortgage bonds are entitled to a priority of lien superior to both of the other bond issues. In the event that position were sustained, the public holders of First Mortgage bonds would be entitled to receive payment in full, since the mortgaged assets have a value substantially in excess of their claim.

125. A full record was made on the circumstances of the exchange and pledge of bonds in 1913. Representatives of the three classes of bonds agreed to a compromise, originally proposed by the Trustee, pursuant to which the claims of First Mortgage bondholders and Refunding Mortgage bondholders would be treated alike, in order to avoid the loss of time and money involved in litigation of the priority issues to a final determination. That compromise is embodied in the Trustee's Amended Plan. The SEC Report concludes that the compromise so proposed represents a reasonable settlement of the issues raised.

126. The dispute as to the status of the First Mortgage bondholders is one that may appropriately be settled in a reorganization plan, and the proposed settlement of that dispute is fair and equitable to all of the bondholders affected.

■ 127. As between the senior bondholders of the Debtor and the Adjustment Income Mortgage bondholders, the uncertainty as to the ultimate value of the Debtor's railroad presented an acute problem. The present value of the buildings and railroad together is substantially less than the claims of senior bondholders. The possibility of realizing more than the amount of such senior claims, through a sale of the railroad to a public authority, is a factor in the situation requiring consideration, though not susceptible of precise valuation. If the Trustee's most optimistic hopes were realized in the near future, the Adjustment Income Mortgage bondholders would be entitled to a very substantial participation in the assets and earnings of the Debtor.

128. The Trustee's Amended Plan proposes a corporate structure and distributions of securities calculated to satisfy the conflicting claims of senior and junior bondholders on a fair and equitable basis within a wide range of possible future events.

129. Based on an over-all valuation of $20,500,000 for the reorganized enterprise, senior bondholders would receive approximately $19,550,000 in value of the New Bonds and Class A stock, and junior bondholders approximately $950,-

000 in value of the Class B stock. If the value were to reach $34,000,000, senior bondholders would receive approximately $31,850,000 in value of their new securities, and junior bondholders approximately $2,150,000 in value of the Class B stock.

130. There is no reasonable prospect of the higher value, apart from the possible sale of the railroad. In the event of a sale, the price might be lower or higher than $17,000,000. The Trustee's Amended Plan provides for appropriate sharing of the proceeds in either event, with due regard for the right of senior bondholders to priority of claim; the right of the juniors to come in after senior priorities are satisfied; and the advantage to all investors of avoiding undue complexities of security structure and of providing for ultimate simplification.

131. The precise terms of the Trustee's Amended Plan represent a compromise among informed representatives of all classes of the bonds. They are found to be fair and equitable by the SEC Report. A holder of Adjustment Income Mortgage bonds subsequently appeared in the proceedings, and submitted a memorandum and argument in opposition to the Plan, urging in substance that the reorganization of the Debtor be deferred until the potential prospects of realization from sale to a public authority could be more fully explored and evaluated. In the judgment of the Court, such delay of indefinite duration is not warranted under the circumstances of this case. The Court finds that the compromise agreed to by bondholder representatives is a reasonable one, and that the Trustee's Amended Plan provides fairly and equitably for the claims both of the senior and junior bondholders.

132. The proposed amendment submitted by another representative of junior bondholders, which would provide that the date fixing the allocation of sales proceeds in excess of $17,000,000 be determined by the execution of a contract to sell, rather than by consummation of the sale, is not approved. The method set up in the Trustee's Amended Plan has the general approval of bondholders of all classes, and is better geared to the objective of increasing the share of senior bondholders to reflect the lapse of time before satisfaction of their prior claims. The SEC Report considers the proposed amendment, advising that the proposed diminution in the contingent participation of senior bondholders would be inappropriate.

133. In another respect, relatively minor, the SEC Report concludes that the proposed amendment requiring the Court to designate the initial directors of the Real Estate Company and the Railroad Company from among nominees of bondholders should be incorporated in the Trustee's Amended Plan. The Court concurs in this view, and will require the Trustee to submit a further amendment, providing that the initial boards of both companies will be selected by the Court from among the nominees of bondholders, after giving appropriate consideration and weight to the ownership interest of the nominators in such bonds.

### Feasibility

134. The proposed bonds of the Real Estate Company will be adequately secured by the value of the real estate assets alone. The Real Estate Company may issue up to $2,500,000 principal amount of Prior Lien Obligations, so far as that is necessary in whole or in part to complete the prompt modernization of the Hudson Terminal buildings, or in lieu thereof may finance such modernization by loans from banks.

135. The lien, principal amount, interest rate, and sinking fund requirements of the New Bonds were the subject of the compromise negotiations, and have been approved by the SEC Report.

136. The division of the common stock into two classes with special class voting rights until June 30, 1965, or until a sale of the Railroad Company stock or property, whichever shall first occur,

and special class rights in the distribution of sale proceeds, if any, in excess of $17,000,000, appears appropriate in view of the special problems presented in this reorganization. The corporate complexities involved in the two classes of stock are necessary, in order to permit prompt reorganization on a basis that is fair and equitable both to senior and junior bondholders. Moreover, under the terms of the Trustee's Amended Plan, these complexities will be reduced as time goes on, and will disappear upon consummation of a sale of the Railroad Company stock or assets or by March 1, 1970, whichever first occurs.

137. Under the Trustee's Amended Plan, the new Railroad Company will have no securities outstanding other than common stock, and all of the common stock will be held by the Real Estate Company. The Railroad Company will own the Debtor's railroad system (except the Hudson Terminal facilities which it will have the right to use) and rolling stock, and enough current assets to cover its liabilities, provide working capital, and meet all estimated cash requirements for a period of two years. Its parent company, the Real Estate Company, although under no obligation to do so, will be in a position, with due regard to the interests of its security holders, to advance additional funds if subsequently required for railroad operations.

138. The State of New Jersey and the Board of Public Utility Commissioners of the State of New Jersey ("The New Jersey Board") objected to the Trustee's Plan (unchanged in this respect in the Amended Plan) upon the ground that it is tantamount to an abandonment of the railroad, stating: "To remain in active service the railroad operation must continue to receive the support of the real estate operation." A similar objection was made by representatives of some of the Debtor's railroad employees.

139. Those objections are without merit. They are based upon the theory that rentals paid by tenants of office space in the Hudson Terminal buildings must be retained as a subsidy for passengers of the railroad, at whatever sacrifice to the interests of investors. However, there is no requirement that persons engaged in both a public utility business and other businesses not affected with a public interest must devote their non-utility assets to the support of the utility operations. On the contrary, any such requirement might involve an unconstitutional taking of property. Under these circumstances, it is entirely appropriate, if not legally necessary, that the Debtor's real estate business be separated from its railroad operations.

140. The separation of the railroad into a corporate subsidiary of the Real Estate Company is also appropriate in terms of the possibility that a public authority may desire to acquire and operate the railroad, with or without the Hudson Terminal buildings. The Trustee's Amended Plan would permit either type of acquisition, as well as permitting private operation both of the real estate and the railroad businesses.

141. No objections to the Trustee's Plan or Amended Plan were filed by the ICC or by the New York Public Service Commission. A letter submitted by the ICC states that upon analysis of the pertinent facts concerning the capital structure to be created, Division 4 of the ICC has no suggested amendments or objections to offer. The letter further notes that before consummation ICC authority will apparently be required under Sections 1(18) and 20a of the Interstate Commerce Act, 49 U.S.C.A. §§ 1(18), 20a and that the absence of objections or suggestions should not be construed as indicating the action which the Commission might take upon application for such authority.

142. The Real Estate Company will be in a sound position to meet the obligations imposed by its capital structure, will have adequate working capital to conduct its operations, and will be in a

position to finance such capital expenditures as may be necessary in order to protect its earning power and investment value. The Railroad Company as a wholly-owned subsidiary of the Real Estate Company will also be in a sound position to meet its obligations, and will have adequate working capital to conduct its operations. In the light of the Railroad Company's lack of earning power, it will not be in a position to finance sizeable capital investments without assistance from the Real Estate Company. Nevertheless, the Railroad Company will be in a position to continue its operations. If it should ultimately be unable to support itself and if the Real Estate Company is not then willing to subsidize the railroad operations, it may then be necessary for the railroad operations to be discontinued unless public agencies should intervene.

## Conclusions

143. The terms of the Trustee's Amended Plan comply with Section 216 of the Act, 11 U.S.C.A. § 616. The filing thereof and the proceedings thereon comply in all respects with the Act.

144. The only creditors who are affected by the Trustee's Amended Plan, within the meaning of Section 175 of the Act, 11 U.S.C.A. § 575, are the holders of claims in Classes E (publicly-held First Mortgage bonds), F (Refunding Mortgage bonds), G (Adjustment Income Mortgage bonds), and I (general unsecured claims).

145. The Trustee's Amended Plan should be modified to provide for the selection of the initial boards of directors of the reorganized companies from among nominees of bondholders. Subject to that modification, the Trustee's Amended Plan is fair and equitable, and feasible. Upon the filing of an appropriate amendment, an order may be submitted approving the Trustee's Amended Plan as so modified; and fixing a time within which the creditors affected thereby may accept it.